**Hsue Li LEE, Petitioner,**

v.

**Janet RENO, Attorney General of the United States, Respondent.**

**No. Civ.A. 97–2308(JHG).**

United States District Court, District of Columbia.

July 27, 1998.

Ronald Lee Castle, Lynda Zengerle, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Hsue Li Lee, petitioner.

Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for Janet Reno, Attorney General of the United States, respondent.

Lee Gelernt, Lucas Guttentag, Cecilia Wang, Michael Wishnie, New York City, for American Civil Liberties Union Immigrants' Rights Project, Amicus.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Recent sweeping changes to the nation's immigration laws, passed by Congress and signed by President Clinton in 1996, have presented a number of difficult interpretive issues to the federal courts. This is one of those cases—one that raises two very important questions of statutory and, potentially, constitutional interpretation. The first is whether Congress intended only to streamline judicial review of final orders of deportation or whether it intended to remove federal courts from the picture altogether. If it is the latter intent, the question arises as to whether the Constitution imposes limits on Congress's ability to sideline the federal judiciary in this context. The second question of interpretation concerns whether Congress intended one of the 1996 statutes to apply retroactively so as to eradicate all pending applications for a waiver of deportation filed

by aliens facing deportation for reasons of prior criminal convictions.

With respect to the issue of federal court jurisdiction, the applicable provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") provides in part that except as otherwise stated in § 1252 of the Immigration and Nationality Act ("INA") and *"notwithstanding any other provision of law,* no court shall have jurisdiction to hear any cause or claim" related to the Attorney General's decision to deport an alien. Pub.L. No. 104–208, Div.C., § 306, 110 Stat. 3009–546 (enacted Sept. 30, 1996). An average reader might well conclude that Congress intended the agency's decision to be *the* final decision, with no recourse to the judicial branch of government available. Such a reader might be surprised to learn that the majority of courts that have interpreted the above-quoted language have concluded that the doors of the federal courts remain open to persons seeking to challenge such agency decisions. Indeed, even counsel for the Government does not argue that the statute really means that *no* court is available to hear petitions for habeas corpus, only that *this* Court cannot hear this case.

To understand this puzzling position, it is necessary to explore certain sophisticated understandings that have arisen between the legislative, executive, and judicial branches regarding how statutes that test the reach of Congress's power under the Constitution will be interpreted by the courts. In the final analysis, this Court joins those that have held that Congress did not intend to deprive federal district courts of jurisdiction to hear cases such as this.

Because jurisdiction is present, the Court also addresses the merits of this case concerning retroactive application of the 1996 legislation. To understand the merits, more detail is in order. Hsue Li Lee (a.k.a. "Davy Lee" and hereafter "Lee"), a legal permanent resident in the United States for twenty-six years, has been ordered by the United States Immigration and Naturalization Ser-

vice ("INS") to be deported to Taiwan. Lee has filed a petition for a writ of habeas corpus, asking this Court to review the legality of his detention by the INS. He admits that he is "deportable" because he fired a handgun at some road signs in rural Virginia in 1988, and has a prior burglary conviction, but he says that he should not be deported without receiving a hearing on his application for a waiver of deportation.[1]

Lee filed his application for a waiver near the end of 1994, and his application remained pending for nearly two years while he was released on bail. When the INS took up Lee's application, it refused to consider whether it should give Lee such a waiver because Attorney General Reno had determined that Congress meant to extinguish all pending applications for waivers, such as Lee's, when it passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, § 440(d), 110 Stat. 1214 (Apr. 24, 1996). For the reasons stated below, the Court holds that the Attorney General erroneously interpreted AEDPA and that Lee is entitled to have a hearing before the INS on whether he should receive a waiver of deportation.

## I.

For purposes of the present motion, the facts alleged by Lee are taken to be true. Lee was born in Taiwan in February 1963. At that time, his father was a permanent resident of the United States. In February 1972, just shy of Lee's eighth birthday, Lee, his mother, and his siblings entered the United States. He has remained in this country since that time.

## A.

During high school, Lee began to abuse alcohol, and he began to get into trouble. When he was 18, he was convicted of petty larceny. Shortly after serving one month of a year-long sentence, he traveled to Illinois, became intoxicated, and engaged in acts that led to a burglary conviction. He served 12

---

1. He seeks to demonstrate, for example, that he has lived in this country since he was eight years old, has been a permanent resident alien ever since, speaks only English, has no real family ties

in Taiwan, has married a United States citizen and has a child by her, is convicted of nonviolent offenses that happened a long time ago, and has substantially reformed himself.

months of a three-year sentence. In 1984, Lee violated the terms of his probation by traveling to California without advising his probation officer. He was extradited to Illinois, where the three-year sentence was reimposed. There is no dispute that under 8 U.S.C. § 1251(a)(4), these convictions rendered Lee a "deportable alien." Although the INS was made aware of Lee's incarceration in Illinois, the agency did not initiate deportation proceedings at that time.

In September 1988, Lee was arrested for having shot some road signs in rural Virginia with his hand gun. He was drunk at the time. Lee was convicted on three misdemeanor counts of: (1) discharging a firearm along a road, (2) destruction of property, and (3) reckless handling of a firearm. Lee disputes whether, under the INA, these misdemeanor counts were "crimes of moral turpitude" that would have independently rendered him deportable, but he acknowledges that a subsequent amendment to the INA, Pub.L. No. 100–690 § 7344(a), *codified as* 8 U.S.C. § 1251(a)(14) (West Supp.1989), explicitly made retroactive by Congress, rendered him deportable for the shooting incident. *See* Pet.'s Mem. at 6.

In December 1989, shortly after serving his sentence on the misdemeanor convictions, Lee received another in a series of citations for driving while intoxicated. He was charged as a habitual offender, and he received a five-year sentence, of which he served approximately 15 months. He was released in March 1991.

### B.

In September 1991, Lee met Elaine ("Poore") Vasbinder ("Poore"), and his life took a turn for the better. Poore is a United States citizen who was separated from her husband, David Vasbinder ("Vasbinder"), at the time she met Lee. Poore was living on public assistance with her father, stepmother, and her partially-disabled son, Jonathan. Under the terms of an August 1991 consent order, Poore and Vasbinder had agreed that Poore would have permanent custody of Jonathan; Vasbinder would provide interim child support.

Lee moved in with Poore and her family shortly after they met. He secured employment, began to participate in Alcoholics Anonymous, and sought out individual therapy to help him overcome his dependence on alcohol. Shortly after meeting Lee, Poore also secured employment and became independent of public assistance. Since 1991, Lee has not consumed alcohol. Lee's only post–1991 trouble with the law resulted in several months of incarceration after he refused to go to a live-in rehabilitation program, as directed by his probation officer. Poore 2d. Aff. ¶¶ 19–20.

Lee and Poore discussed the prospect of marrying after Poore's divorce from Vasbinder became final. However, progress toward an uncontested divorce was blocked by disagreements over alimony, the division of assets, and the amount of child support. In August 1992, Vasbinder sued for divorce, and Poore cross billed for adultery. After contentious discovery, trial was set for September 1993, and was subsequently continued. Poore and Lee had agreed that they would marry promptly after the final divorce decree was entered. In October 1993, Poore, with Lee's support, rejected a settlement and pressed ahead for trial.

In December 1993, INS officers arrested Lee and served him with an order to show cause why he should not be deported as a result of his 1988 criminal conviction—the sign-shooting incident. Poore realized that were she to marry Lee, it might provide a basis to prevent Lee's deportation. As a result, in December 1993, she offered Vasbinder a divorce settlement on nearly the same terms he had offered in October. Nonetheless, Vasbinder was slow to respond. Ultimately, they reached a settlement, and a final divorce decree was entered on April 18, 1994. Lee and Poore obtained a marriage license on April 12, and they were wed on April 21, 1994.

### C.

The timing of Lee's marriage to Poore had significant consequences with respect to his deportation proceedings. Lee contends that at the time of his arrest, certain factors weighed in favor of his obtaining a waiver of

deportation under Section 212(c) of the INA, *codified as* 8 U.S.C. § 1182(c) [hereafter " § 212(c)"], such as his length of residence in the United States, his lack of connections in Taiwan, his employment history, and the nature, severity, and age of the crimes rendering him deportable. *See Mojica v. Reno,* 970 F.Supp. 130, 178–79 (E.D.N.Y.1997). Arguably these considerations were irrelevant because the above-mentioned *post facto* amendments to the INA foreclosed Lee from obtaining a waiver under § 212(c) on the ground that the offense rendering him deportable involved a firearm. However, if Lee were to have his immigration status adjusted based on a *bona fide* marriage to a United States citizen, the § 212(c) waiver would be available notwithstanding the firearm offense. Poore's assessment had been correct. Her marriage to Lee, if *bona fide,* would indeed impact the probability of his deportation.

Under applicable law, when a marriage occurs after deportation proceedings have commenced, the INS must approve the marriage as *bona fide* before it can consider the marriage as a basis for adjusting the immigration status of the alien facing deportation. *See* 8 U.S.C. § 1255(e). Poore expeditiously filed the necessary paperwork to have the marriage approved, but because of the delays in finalizing her divorce, Lee's deportation proceedings were far along by the time that paperwork was filed.

Indeed, the hearing on the INS's show cause order was held April 20, 1994—the day before Lee and Poore were married. Lee had retained immigration counsel shortly after he was arrested. Lee's immigration counsel asked the Immigration Judge ("IJ"), who had presided over Lee's bond hearing, to continue the show cause hearing on the basis that Lee's imminent marriage would render him eligible for an adjustment of status and a waiver. Lee's immigration counsel also requested that a hearing be scheduled to consider an adjustment of status and waiver. Counsel for the INS argued that no matter how soon the wedding would be, there was no basis in the record for delay as of that moment, and asked for the hearing to proceed. The IJ agreed, and after Lee pled to

the underlying convictions, he was ordered to be deported. The IJ did suggest that if the INS approved the Lee–Poore marriage, Lee could move to reopen the proceeding to have a hearing on an adjustment of status and application for a § 212(c) waiver.

The application for INS approval of their marriage ("Form I–130") was completed May 10, 1994, and filed with Bruce Dizengoff, the INS attorney prosecuting Lee's deportation case, on May 16, 1994. The final hearing before the IJ was held on May 27, 1994 to determine whether Lee was eligible for voluntary departure. At that hearing, Lee's immigration counsel again requested a continuance so that a decision on Lee's Form I–130 application could be made first. In particular, counsel pointed out that because Dizengoff's office had control over the initial Form I–130 decision, it would be fundamentally unfair to allow the same office that had the power to make Lee eligible for a waiver of deportation to, at the same time, press ahead for his speedy deportation. In response, Dizengoff argued that, fairness aside, precedent from the Board of Immigration Appeals ("BIA") specifically precluded a continuance to await a decision on a pending Form I–130 application. The IJ did not grant a continuance and held that Lee was statutorily ineligible for voluntary departure.

Approximately one week after the hearing, the INS scheduled interviews to consider the Form I–130 application. It was evident that the deadline for appeal of the deportation order would expire before the Form I–130 process could be complete. Consequently, Lee appealed to the BIA, removing jurisdiction over the case from the IJ. Lee was released on bail pending decision on his appeal. On June 22, 1994, the INS approved Lee's marriage to Poore.

On September 14, 1994, Lee's immigration counsel filed a motion to reopen the deportation proceedings so that Lee could be considered for an adjustment of status and a waiver of deportation under INA § 212(c). The motion was not frivolous. *See* 8 C.F.R. § 3.2(a) (setting out factors governing motions to reopen). At the same time, briefing on Lee's appeal continued, and was completed on November 28, 1994.

In the meantime, Lee continued to be employed as a sheet metal worker. Poore became pregnant with the couple's daughter, Ashley, who was born in December 1995. There had been difficulties during the pregnancy, and the couple decided that Poore would not return to work; they would instead rely solely on Lee's income. Poore 2d. Aff. ¶ 63. On April 24, 1996, 17 months after Lee's pending appeal and application to reopen the record had become ripe for decision, Congress passed AEDPA. AEDPA amended INA § 212(c) to preclude waivers for those, such as Lee, convicted of multiple "crimes of moral turpitude." AEDPA did not expressly state whether the amendment would apply retroactively to applications for § 212(c) waivers pending at the time of enactment.

### D.

The BIA took up the question of retroactivity and decided *en banc* that pending applications were unaffected by the amendment. *Matter of Soriano,* Interim Dec. (BIA) 3289, 1996 WL 426888 *4–5 (June 27, 1996). The Commissioner of the INS moved the Attorney General to review the BIA's decision, which she did. On February 21, 1997, the Attorney General reversed the BIA. *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888 (Feb. 21, 1997) (beginning at *16).

Approximately two months later, the BIA dismissed Lee's case on the ground that the Attorney General's *Soriano* decision rendered Lee statutorily ineligible for an adjustment of status and a waiver of deportation. *See* Pet.'s Mem. Ex. 17. On May 23, 1997, Lee sought direct review of the BIA decision by filing a petition for review in the United States Court of Appeals for the Fourth Circuit. That Court denied the petition for lack of jurisdiction, *id.* Ex. 19 (Order in *Lee v. INS,* No. 97–1677 (4th Cir. Aug. 14, 1997), presumably interpreting AEDPA § 440(a) and IIRIRA § 309(c)(4) to extinguish direct review of final orders of deportation in the federal courts of appeals).

On October 3, 1997, Lee filed the instant Petition for a Writ of Habeas Corpus asking this Court to review whether the BIA's dismissal of his case was based on an erroneous interpretation of AEDPA. On October 9, 1997, the Court issued an Order to Show Cause why a writ should not issue.[2] On that same day, Lee was arrested and detained by the INS. Until very recently, he was being held at a correctional facility in Hopewell, Virginia. On the day before this Opinion and Order issued, Lee's counsel, serving *pro bono publico,* advised the Court that Lee had been released *pendente lite* on July 7, 1998.

### II.

As was stated at the opening of this Opinion, two principal issues are presented here: (1) which federal court, if any, has jurisdiction to hear Lee's claims; and (2) if this Court retains jurisdiction, whether the Attorney General erroneously interpreted AEDPA § 440(d) to have retroactive effect. For the reasons set forth below, the Court holds that, with respect to two 1996 amendments to the INA, Congress neither explicitly nor impliedly repealed the grant of jurisdiction in 28 U.S.C. § 2241 to issue writs of habeas corpus to persons in federal custody, such jurisdiction having been continuously exercised since 1789 and having at all times been available in immigration cases. The Court further holds that the scope of such habeas review extends at least to pure issues of law, such as that presented by the instant petition. Finally, with respect to the legal issue presented by Lee's petition, the Court holds that Congress did not intend AEDPA § 440(d) to extinguish applications such as Lee's. The writ shall issue.

### A.

Enshrined in the Constitution is the fundamental right to test the legitimacy of an executive detention in a habeas corpus proceeding. U.S. CONST. art. I, § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."); *see also* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens,* 98 Colum.L.Rev. 961,

---

**2.** Briefing and oral argument on the Show Cause     Order extended into early 1998.

970–76 (1998) [hereafter "Neuman, *Habeas Corpus* "] (discussing history and interpretation of the Suspension Clause). To enforce that right, Congress brought the lower federal courts into existence and conferred upon them habeas jurisdiction in the Judiciary Act of 1789; that jurisdictional grant now being codified at 28 U.S.C. § 2241. *See Felker v. Turpin*, 518 U.S. 651, 659 & nn. 1, 2, 116 S.Ct. 2333, 2338 & nn. 1, 2, 135 L.Ed.2d 827, —— & nn. 1, 2 (1996).

More than a century ago, the Supreme Court recognized that aliens had the right to invoke the habeas jurisdiction of the federal courts, *United States v. Jung Ah Lung*, 124 U.S. 621, 626, 8 S.Ct. 663, 31 L.Ed. 591 (1888), and, prior to 1996, aliens facing deportation could rely on § 2241 as the basis for challenging the lawfulness of their detention. *E.g., Orozco v. U.S. INS,* 911 F.2d 539, 541 (11th Cir.1990). At issue in this case is whether § 2241 has survived the enactment of AEDPA and IIRIRA, and if it has not, whether the Suspension Clause or some other constitutional provision requires that a non-legislative court be available to review the order of deportation. Both sides in this dispute agree that the plain language of AEDPA and IIRIRA purporting to eliminate all judicial review of deportation orders cannot be given effect precisely as stated, and that the statutes must be interpreted with reference to certain background understandings and interpretive rules of which Congress was aware at the time the Acts were passed. The dispute between the Government on one side and Lee and *amicus,* the American Civil Liberties Union ("ACLU"), on the other centers on which background rules should guide interpretation of these Acts.

Historical understandings of federal habeas jurisdiction are one source to which both sides refer. Congress first acted to limit aliens' access to federal courts more than 100 years ago. As described in *Heikkila v. Barber*, 345 U.S. 229, 233–36, 73 S.Ct. 603, 97 L.Ed. 972 (1953), in immigration acts passed in 1891, 1903, 1907, and 1917, Congress expressed an intent to make certain decisions of the Attorney General or inferior officers "final." While none of those Acts expressly repealed statutory habeas jurisdiction, it was recognized that "Congress had intended to make these administrative decisions non-reviewable to the fullest extent possible under the Constitution." *Id.* at 234, 73 S.Ct. 603.[3] Whether as a matter of constitutional law or statutory construction, it was understood that Congress had not suspended, and, perhaps, could not suspend, the availability of habeas corpus proceedings for aliens facing deportation. The federal courts remained open to inquire into the legality of an alien's detention pursuant to a petition for a writ of habeas corpus, notwithstanding the "finality" of an executive branch decision. *See Heikkila,* 345 U.S. at 235, 73 S.Ct. 603.

In 1952, Congress passed the INA, 66 Stat. 163, *codified as* 8 U.S.C. §§ 1101 *et seq.,* which remains the framework statute governing immigration to this day. Because the INA was enacted after passage of the Administrative Procedure Act of 1946 ("APA"), the Supreme Court had to determine whether the judicial review provisions in section 10 of the APA also applied to agency action excluding or deporting aliens. The Court concluded that declaratory judgment actions under the APA were indeed available in addition to habeas corpus review. *See Shaughnessy v. Pedreiro,* 349 U.S. 48, 51–52, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (deportation); *Brownell v. We Shung,* 352 U.S. 180, 183–84, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956) (exclusion).

In the 1961 Immigration Act, Congress replaced general APA review of deportation orders with a more tailored scheme by extending provisions of the Hobbs Act, 64 Stat. 1129, to deportation proceedings. Under the 1961 Act, a petition for review in the federal courts of appeals became the "sole and exclu-

---

**3.** This statement can be understood to mean that the habeas review conducted under the 1917 Act gave practical meaning to the scope of review required by the Constitution. But the decision also can be understood as involving statutory construction rather than constitutional interpretation. *See Goncalves v. Reno,* 144 F.3d 110, 120 (1st Cir.1998) (suggesting that pre–1961 habeas jurisdiction was "exercised pursuant to § 2241" rather than the Suspension Clause); Richard H. Fallon, Jr., *Applying the Suspension Clause to Immigration Cases,* 98 Colum.L.Rev. 1068, 1085 & n. 90 (1998) [hereafter "Fallon, *Applying the Suspension Clause* "].

sive procedure" for seeking review of a deportation order in federal court. Immigration and Nationality Act, Pub.L. No. 87–301, § 106(a), 75 Stat. 650, 651 (codified at 8 U.S.C. § 1105a(a) (1994) (repealed 1996)). Simultaneously, Congress also specifically provided that habeas review of deportation orders remained available.[4] While at first blush, there may be some apparent tension between the "sole and exclusive" petition-for-review process in the court of appeals and the availability of habeas proceedings in the district courts, the tension is resolved by understanding a habeas corpus proceeding to be a distinct inquiry into the lawfulness of an executive detention, not as judicial review of an agency decision.[5]

### B.

The Attorney General argues that in the 1961 Immigration Act, Congress either impliedly repealed or superseded the general habeas jurisdiction granted in 28 U.S.C. § 2241 by creating the express habeas provision for deportees, 8 U.S.C. § 1105a(a)(10)[6] (repealed 1996) (hereafter referred to as the "INA habeas provision"), and making the petition-for-review scheme the sole and exclusive procedure for direct review. As will be seen, the argument continues that with § 2241 out of the background, the subsequent elimination of both direct review and the INA habeas provision meant that the federal courts retain only that residual jurisdiction required by the Constitution.

■ The first step in that analysis is fatally flawed. The overlay of a specific grant of habeas jurisdiction on top of a long-standing general grant neither compels nor even suggests the conclusion that the general grant has been eliminated. Indeed such a conclusion is expressly disfavored. *See Felker*, 518 U.S. at 660, 116 S.Ct. 2333; *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 105, 19 L.Ed. 332 (1869). The two can, did, and were intended to peacefully coexist. *See* H.R.Rep. No. 1086, 87th Cong., 1st Sess. (Aug. 30, 1961) *reprinted in* 1961 U.S.C.C.A.N. 2950, 2973 ("The section carefully preserves the writ of habeas corpus to an aline detained in custody pursuant to a deportation order."). No case cited by the Attorney General, or otherwise, holds that the 1961 Act repealed § 2241 jurisdiction. *Accord Goncalves*, 144 F.3d at 120. On the contrary, the cases appear to have viewed the two provisions as working hand-in-hand.[7]

### C.

The Attorney General argues in the alternative that even if Congress had not taken the § 2241 door to the courthouse and slammed it shut on detainees facing deportation in 1961, it certainly did so in 1996.[8] Her argument is that the Court should construe the judicial review provisions of AEDPA and

---

4. *See* 8 U.S.C. § 1105a(a)(10) (1994) (repealed 1996) ("any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings").

5. *See Foti v. INS*, 375 U.S. 217, 231, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963) (stating that even though a denial of discretionary relief was a "final order" subject to the "sole and exclusive" review in the courts of appeals, "our decision in this case in no way impairs the preservation and availability of habeas corpus relief."). This conceptual resolution of any apparent tension in the statutory text did not resolve the practical problem of whether an alien facing deportation could circumvent review in the courts of appeals by first initiating a habeas proceeding. Courts addressing this issue stated that the scope of habeas review was circumscribed by the 1961 Act and could not be used to bypass the process and time limits for direct review. *E.g., Nakaranurack v. United States*, 68 F.3d 290, 294 (9th Cir.1995).

6. Initially, the INA habeas provision was codified as 8 U.S.C. § 1105a(a)(9) but it was subsequently renumbered as 8 U.S.C. § 1105a(a)(10).

7. To support its statement that "[c]hallenges to deportation proceedings are cognizable under 28 U.S.C. § 2241," the *Orozco* court cited *United States ex. rel. Marcello v. District Director of INS*, 634 F.2d 964, 967 (5th Cir. Jan.1981). However, the cited section of the case discusses the establishment of INA habeas not § 2241. Directly, on point though was the *Marcello* court's discussion at 634 F.2d at 970–72, where it rejected the Government's argument that the INA habeas provision scaled back the scope of habeas review provided by § 2241 to the constitutional minimum. The historical record simply does not confirm the revisionist argument advanced here by the Attorney General.

8. The argument is limited to detainees facing deportation by reason of certain prior criminal convictions.

IIRIRA with a sense of partnership in aiding Congress to accomplish its goal of reducing to the absolute minimum the intrusiveness of judicial review for criminal aliens facing deportation. When read in that light, the irreducible review remaining is habeas corpus review only in the courts of appeals limited in scope to substantial constitutional questions. Neither the textual provisions of AEDPA and IIRIRA nor the applicable rules of statutory construction support this reading. If Congress had intended to achieve the result that the Attorney General's creative but tortured reading would yield, it could have done so plainly.

AEDPA was signed into law on April 29, 1996. In a one-two combination AEDPA § 401(e) expressly repealed the INA habeas provision, and § 440(a) eliminated the jurisdiction of the courts of appeals to consider petitions for review by criminal aliens and replaced it with the following:

> (a) JUDICIAL REVIEW—Section 106 of the [INA] is amended as follows:

> (10) Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i), shall not be subject to review by any court.

Pub.L. No. 104–132, § 440(a), 110 Stat. 1214, 1276 (Apr. 24, 1996). The courts of appeals that have published opinions construing this section all agree that Congress had the power to withdraw their jurisdiction, and did so. *See LaFontant v. INS*, 135 F.3d 158, 163–64

(D.C.Cir.1998) (collecting cases); *see also Goncalves*, 144 F.3d at 126 & n. 19 (same). Some circuits, however, conditioned their construction of § 440(a) on the continued availability of some form of habeas review.[9] While the Fourth Circuit has not published an opinion explaining its views on the new Acts, it dismissed Lee's petition for review for lack of jurisdiction. Pet.'s Mem. Ex. 19.[10]

Five months after AEDPA was enacted, Congress returned to the immigration field with the IIRIRA, a more sweeping reconfiguration of the statutory framework. The IIRIRA replaced the AEDPA's § 440(a) judicial review provision with a set of transitional rules and a new permanent judicial review provision.[11] The transitional rules apply to deportation proceedings, such as Lee's, commenced before April 1, 1997. IIRIRA § 309(c)(1), as amended by Act of Oct. 11, 1997, § 2, Pub.L. No. 104–302, 110 Stat. 3656, 3657, provides:

> Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings [before April 1, 1997]—

> (A) the amendments made by this subtitle shall not apply, and

> (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

Taken alone, this provision would appear to contemplate that for cases governed by the transitional rules, judicial review would be subject to INA § 106 (as then in effect), which IIRIRA § 306(b) repeals. Under the pre-AEDPA INA § 106, the courts of appeals retained jurisdiction to review final agency action. *See* 28 U.S.C. § 2344 (1994). However, IIRIRA § 309(c)(1), which estab-

9. *E.g., Turkhan v. INS*, 123 F.3d 487, 490 (7th Cir.1997); *Kolster v. INS*, 101 F.3d 785, 786 (1st Cir.1996); *Salazar–Haro v. INS*, 95 F.3d 309, 311 (3d Cir.1996); *cf. Ramallo v. Reno*, 114 F.3d 1210, 1213 (D.C.Cir.1997) (relying on Government's concession that even under IIRIRA's judicial review provision, "habeas review remains available to appellee to raise substantial constitutional questions"), *petition for cert. filed and carried over*, 67 U.S.L.W. 3054 (U.S. Sep. 24, 1997) (No. 97–526).

10. The other significant AEDPA provision for this case is § 440(d), which greatly expands the class

of criminal aliens ineligible to apply for a § 212(c) waiver of deportation. Section V., *infra*, takes up the question of whether Congress intended § 440(d) to apply retroactively.

11. *See* IIRIRA § 309(c), as amended by Act of Oct. 11, 1997, § 2, Pub.L. No. 104–302, 110 Stat. 3656, 3657. As made clear by the technical amendments, the new permanent rules under IIRIRA are effective for cases in which the INS instituted removal proceedings on or after April 1, 1997.

lishes the transitional rules, is subject to IIRIRA § 309(c)(4)(G), which provides:

> (4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the cases described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of date of enactment of this Act) to the contrary—
>
> \*     \*     \*     \*     \*     \*
>
> (G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered ... by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

The parties agree that Lee is covered by the language of § 309(c)(4)(G), and thus the courts of appeals lack jurisdiction to provide direct review of Lee's deportation order.

It would seem that the only jurisdictional provision directly requiring interpretation in this case is Congress's directive that "there shall be no appeal permitted" in cases such as Lee's. But in addition, the judicial review provision of the permanent rules are made applicable to Lee's case by IIRIRA § 306(c), as amended by the Act of Oct. 11, 1997, § 2, Pub.L. No. 104–302, 110 Stat. 3656, 3657.[12] The permanent rules, IIRIRA § 306, add new INA § 242(g), 8 U.S.C.A. § 1252(g) (West Supp.1998):

> (g) EXCLUSIVE JURISDICTION.—Except as provided in this section [i.e., new INA § 242] and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases,

or execute removal orders against any alien under this Act.

## D.

In summary, the following statutory provisions are all directly relevant to whether this Court has jurisdiction over Lee's habeas petition:

> (1) AEDPA § 401(e), entitled "Elimination of Custody Review By Habeas Corpus," which struck the INA habeas provision but remained silent with respect to 28 U.S.C. § 2241 habeas jurisdiction;
>
> (2) IIRIRA § 309(c)(4)(G), directing that "no appeal shall be permitted" in cases such as Lee's;
>
> (3) IIRIRA § 306, declaring that "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act;" and
>
> (4) 28 U.S.C. § 2241, entitled "Power to Grant Writ," which provides, in pertinent part, that "(a) Writs of habeas corpus may be granted by ... the district courts ..." and "(c) [t]he writ of habeas corpus shall not extend to a prisoner unless— ... (1)[h]e is in custody under ... the authority of the United States.... or ... (3)[h]e is in custody in violation of the Constitution or laws or treaties of the United States."

In the background are a number of constitutional provisions that may be implicated if it appears that Congress intended to insulate the INS's decision to deport criminal aliens from any judicial process whatsoever.[13]

IIRIRA § 306 is the most sweeping provision, and it potentially supersedes the oth-

---

**12.** Section 306(c) provides that the judicial review provision under the permanent rules, new INA § 242(g), shall apply "without limitation to claims arising from all past, pending or future exclusion, deportation or removal proceedings under this Act." While there appears to be some confusion about the effective date of § 306(c)(1), *see Sabino v. Reno,* 1998 WL 313305 \*10

(S.D.Tex. June 1, 1998), our Court of Appeals has approved the retroactive application of this provision. *See Ramallo,* 114 F.3d at 1213.

**13.** These are, at a minimum, the Suspension Clause, the Due Process Clause, Article III, and the Equal Protection Clause.

ers, so interpretation begins with it. On its face, § 306 is seemingly unambiguous. First, it instructs the reader to look nowhere else in the United States Code, the Code of Federal Regulations, or even in the Constitution, to understand its meaning, i.e., "[e]xcept as provided in this section and notwithstanding any other provision of law." Section 306 announces that "no court shall have jurisdiction," where the term "court" is without express limitation and, if taken literally, purports to apply to Article III courts, state courts, and even Article I or legislative courts, such as Immigration Judges and the Board of Immigration Appeals. The phrase "shall have jurisdiction" speaks to the power, or in this case the lack thereof, of the Court to proceed.

Jurisdiction has been withdrawn from "any *cause or claim arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." (emphasis added). It is possible that some limitations, express or implied, may be present in the term "cause or claim" and the causal agent "arising from" that brings such cause or claim into existence, but no argument has been presented here to suggest that Lee's habeas petition is anything other than a "cause or claim" that arises from the Attorney General's decision to deport him. Thus, unless there is some other basis in § 1252 for this Court to exercise jurisdiction, the plain language of new § 1252(g), on its face, would appear to deprive this Court of jurisdiction.[14]

### E.

■ No one in this case argues that the language can be taken at face value. If the

only coherent reading of § 1252(g) is that it concentrates the United States Government's full authority to detain and deport aliens in the person of the Attorney General, free from any of the checks or balances the Article III courts may impose, the statute is unconstitutional.[15] As a result, before the issue was even directly raised in this Circuit, the Attorney General stipulated that § 1252(g) required a construction that would save it from being held unconstitutional. *See Ramallo v. Reno*, 114 F.3d at 1214 ("[A]s the Government concedes, habeas review remains available to appellee to raise substantial constitutional questions").

The Government asks the Court to impose a limited saving construction on the language of § 1252(g) such that, "notwithstanding IIRIRA and AEDPA," jurisdiction to review a deportation decision for "substantial constitutional errors" survives. *See* Resp.'s Mem. at 17. In fact, the Government argues that Congress fully expected the courts to read in some implied jurisdiction over constitutional claims. The argument continues that because Congress sought to limit review of deportation orders by Article III courts to the absolute minimum, and because it had previously designated courts of appeals as the "sole and exclusive" source of review under the 1961 Act, the statutes should be read to provide that this limited, implied jurisdiction to review for constitutional error resides only in the federal courts of appeals. The proposal is quite problematic.

■ Although § 1252(g) purports to claim that § 1252 is the exclusive grant of jurisdiction over removal or deportation proceedings conducted by the INS, that assertion must be

---

**14.** The Supreme Court will soon provide the authoritative construction of the section in a different context. *See American–Arab Anti–Discrimination Comm. v. Reno*, 119 F.3d 1367 (9th Cir. 1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 2059, —— L.Ed.2d —— (1998). The question presented on certiorari does not expressly raise the issue of whether habeas jurisdiction survives, *see* —— U.S. ——, 118 S.Ct. 2059, 141 L.Ed.2d 137, but the issue may be addressed nonetheless.

**15.** The Supreme Court has all but held that judicial review of colorable constitutional claims is required by the Constitution, *see Webster v. Doe*, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d

632 (1988); *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 & n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), and our Court of Appeals has said so even more firmly. *See Ramallo*, 114 F.3d at 1213 (quoting *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C.Cir.1987)); *cf.* Note, *The Constitutional Requirement of Judicial Review for Administrative Deportation Decisions*, 110 Harv.L.Rev. 1850, 1860 (1997) [hereafter "Note, *Judicial Review*"] ("the most plausible interpretation of this statute [AEDPA], under which neither direct review nor habeas review is available, seems inescapably unconstitutional").

reconciled with the venerable grant of habeas jurisdiction in 28 U.S.C. § 2241. *See Felker*, 518 U.S. at 659 & n. 1, 116 S.Ct. 2333. As an express grant of jurisdiction, § 2241 is protected by the normal presumption that subsequent statutes will not be read to impliedly repeat it unless the exercise of § 2241 jurisdiction would be repugnant to the subsequently-enacted statute. *See Felker*, 518 U.S. at 660, 116 S.Ct. 2333; *United States v. Fausto*, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change."). It may also be that standing sentinel over § 2241 is a special clear statement rule.[16] If that is so, then even in the rare circumstances in which an implied repeal would be found, § 2241 jurisdiction would remain intact absent a clear congressional statement to the contrary.

While the *Felker* Court appeared to rely solely on the canon disfavoring implied repeals when it concluded that its original habeas jurisdiction under § 2241 survived AEDPA, 518 U.S. at 660–61, 116 S.Ct. 2333, other courts have read *Felker* more broadly. Perhaps, in light of the fact that Congress

may have been required to confer statutory habeas jurisdiction upon the federal courts, *see Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95, 2 L.Ed. 554 (1807) (Marshall, C.J.), these courts have found § 2241 to be additionally supported by a such a rule. *See, e.g., Goncalves*, 144 F.3d at 120; *Ozoanya*, 968 F.Supp. at 6. The conclusion here is that no need to resort to a special clear statement rule has presented itself because, as *Felker* held, Congress did not specifically repeal § 2241—indeed, it completely ignored the section—and exercise of § 2241 jurisdiction is not repugnant to IIRIRA § 306 despite its sweeping language.

The Attorney General presents two arguments as to why § 2241 jurisdiction in cases such as this did not survive the 104th Congress: either § 2241 was expressly repealed with respect to cases such as this by AEDPA § 401(e)'s deletion of the *INA habeas provision*,[17] or § 1252(g)'s claim of exclusive jurisdiction "except as provided in this section and notwithstanding any other provision of law" is sufficiently clear to "withstand" § 2241 jurisdiction.

While some courts have concluded that Congress has been unmistakably clear in its

---

**16.** In the normal course, Congress is free to pass statutes containing ambiguous provisions with the expectation that courts will endeavor to read them in such a way that best gives effect to congressional purpose. But in certain circumstances, the Supreme Court has announced that absent a clear statement to the contrary, it will apply certain presumptions to statutes even where application of the presumption may frustrate congressional purpose. *See* Vicki C. Jackson, *The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity*, 98 Yale L.J. 1, 110 & nn. 439–41 (1988). If one can safely assume that compromise is an essential component of the legislative process, and that a majority of the Members can agree on ambiguous language more easily than on a statutory "clear statement," then as a practical matter, clear statement rules impose a kind of supermajority requirement on Congress in some instances. *See* Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U.Chi. L.Rev. 800, 821 (1983).

Such rules may nevertheless be legitimate for two reasons: comity and accountability. Clear statement rules act as signposts, warning Congress that specific types of legislation, such as acts that impose liability upon the states or that strip the courts of all jurisdiction, may give rise to constitutional difficulties. By requiring a

clear statement, courts enhance federalist or interbranch comity by limiting adjudication of constitutional questions to those cases in which Congress fully intends to test the limits of its enumerated powers. *See* William N. Eskridge, Jr. & Philip P. Frickey, *Quasi–Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 Vand.L.Rev. 593, 601–02 (1992); Note, *The Avoidance of Constitutional Questions and the Preservation of Judicial Review: Federal Court Treatment of the New Habeas Provisions*, 111 Harv.L.Rev. 1578, 1592 (1998); Note *Clear Statement Rules, Federalism, and Congressional Regulation of States*, 107 Harv.L.Rev.1959, 1960 (1994). Additionally, clear statement rules enhance congressional accountability by requiring Congress to take responsibility for testing the limits of its powers. *Cf. New York v. United States*, 505 U.S. 144, 168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The risk is that such rules can serve to minimize judicial accountability, *see* Eskridge & Frickey, 45 Vand.L.Rev. at 597–98, and use of such rules must be sparing and explicitly justified.

**17.** *See, e.g., Powell v. Jennifer*, 937 F.Supp. 1245, 1252 (E.D.Mich.1996) ("[I]t is difficult to view § 401(e) as expressing anything other than congressional disapproval of habeas relief from orders of deportation.")

intent to slam the § 2241 door shut,[18] the majority have concluded that the language chosen was insufficiently clear, particularly when the alternatives are either to invalidate § 1252(g) or imply the minimum jurisdiction required by the Constitution.[19] I am persuaded that the 1996 statutes, when read against the background knowledge that Congress is presumed to have, were not intended to overturn more than 200 years of history by withdrawing jurisdiction that the lower federal courts have possessed from the moment Congress gave them life.

Consider the history. Previous Congresses had announced more than once that executive branch deportation decisions were "final," and yet at no time did the courts cease to exercise habeas jurisdiction either pursuant to § 2241 or the Constitution. The 104th Congress can be presumed to have known and understood that. *Cf. Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). More recently, the Supreme Court handed down *Felker* shortly after enactment of AEDPA and prior to the enactment of IIRIRA. In light of *Felker,* Congress surely must have been aware that if it sought to repeal § 2241, it had to be accountable and do so explicitly. *Accord Goncalves,* 144 F.3d at 121–22; *Mojica,* 970 F.Supp. at 160–61.

Consider the texts. The Attorney General places primary reliance on AEDPA § 401(e), but the bark of that section is worse than its bite. Although entitled "Elimination of Custody Review By Habeas Corpus," the section only "eliminates" the INA habeas provision without mention of § 2241. It does so notwithstanding the fact that courts had been exercising habeas jurisdiction long before that provision was added in 1961, and some courts expressly understood that § 2241 jur-

isdiction remained after that section had been added. *E.g., United States ex rel. Marcello v. District Director of INS,* 634 F.2d 964, 967 (5th Cir. Jan.1981). Other provisions of 8 U.S.C. § 1252 contemplate the continued availability of habeas relief. *See, e.g.,* § 1252(c); § 1252(e)(2). Because these do not independently confer habeas jurisdiction on any court, either § 1252 incorporates the habeas grant in 28 U.S.C. § 2241 into its sphere of exclusivity, or § 1252's claim of exclusivity implicitly recognizes the continued viability of § 2241 jurisdiction. *See Goncalves,* 144 F.3d at 121–22.

This observation, in part, answers the Attorney General's argument that the "notwithstanding any other provision of law" language in new INA § 242(g) is sufficient to repeal § 2241. To the extent that it does not, the "notwithstanding" provision is simply insufficient in light of *Felker* for the Court to imply a repeal of § 2241. *Felker,* 518 U.S. at 660–61, 116 S.Ct. 2333; *Jean–Baptiste,* 144 F.3d at 218–19; *Goncalves,* 144 F.3d at 122; *Ozoanya I,* 968 F.Supp. at 6–7; *Yesil v. Reno,* 958 F.Supp. 828, 838 (S.D.N.Y. 1997). *But see Hose,* 1998 WL 196260 at *3–4.

Finally, consider the consequences. As the First Circuit points out, the absence of § 2241 jurisdiction would work a particular, and irrational, hardship on all those subject to the transitional provisions of IIRIRA. *See Goncalves,* 144 F.3d at 122. In addition, the Government has already conceded that in the absence of § 2241 jurisdiction, the Court would be required to imply some residual habeas jurisdiction as required by the Constitution. It is not at all clear why this is preferable.[20]

---

18. *E.g., Hose v. INS,* 1998 WL 196260 *3–4 (9th Cir. Apr.24, 1998); *Marriott v. Ingham,* 990 F.Supp. 209, 213–14 (W.D.N.Y.1998); *Mayers v. Reno,* 977 F.Supp. 1457, 1461 (S.D.Fla.1997); *Moore v. District Director, INS,* 956 F.Supp. 878, 882 (D.Neb.1997).

19. *E.g., Jean–Baptiste v. Reno,* 144 F.3d 212, 218–19 (2d Cir.1998); *Goncalves,* 144 F.3d at 120–22; *Sabino,* 8 F.Supp.2d at 630 (collecting cases).

20. The Court is aware of no other decision that has addressed an interpretive problem that bede-

vils the positions of both amicus and the Government. General statutory habeas jurisdiction analogous to § 2241 has been on the books since at least 1867. *See Felker,* 518 U.S. at 659–660, 116 S.Ct. 2333. The immigration acts at the turn of the century, and including the 1917 Act, had provided only that executive deportation decisions were "final," without any of those acts explicitly repealing the federal courts' statutory habeas jurisdiction. *Heikkila,* 345 U.S. at 233–36, 73 S.Ct. 603. Nonetheless, the Government and *amicus* both insist that the courts exercised *constitutional* habeas jurisdiction under the 1917 Act.

### F.

■ In the alternative, if it were found that IIRIRA § 306 did repeal 28 U.S.C. § 2241, this Court holds that the Constitution mandates that habeas review remains available. *See Heikkila,* 345 U.S. at 234–235, 73 S.Ct. 603 (prior immigration acts precluded "judicial intervention in deportation cases except insofar as it was required by the Constitution"); *Ex parte Bollman,* 8 U.S. at 95; Neuman, *Habeas Corpus,* 98 Colum.L.Rev. at 1057 ("The Constitution should continue to be interpreted as guaranteeing [habeas corpus review] to aliens who have already entered the United States and who are facing deportation."); Fallon, *Applying the Suspension Clause,* 98 Colum.L.Rev. at 1096; Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362, 13905–97 (1953) (any statute stating that "no court shall have jurisdiction [including habeas] in such and such a situation ... would be in direct violation of the Constitution"). There is some suggestion that all courts possess inherent jurisdiction to exercise the constitutionally minimum review.[21] But that view goes too far. The Constitution only requires that some court, state or federal, remains available to review the legality of Lee's detention. Indeed, although some courts have suggested that the Suspension Clause vests habeas jurisdiction in the federal courts unaided by statute, "long tradition weighs against that assumption." Neuman, *Habeas Corpus,* 98 Colum.L.Rev. at 1058 n. 565. Constitutionally implied habeas jurisdiction may nevertheless be vested in the federal courts by Article III. *See* Note, *Judicial Review,* 110 Harv.L.Rev. at 1865–67.

The Attorney General concedes that the residual, constitutionally-required habeas jurisdiction remains in some federal courts, and argues either as a matter of policy or statutory construction that the circuit courts of appeals are the appropriate federal courts to exercise such jurisdiction. History and other statutory provisions counsel against the proposal. The Government can point to no area of law, and no point in time, in which original *habeas* jurisdiction has vested solely in the federal circuit courts of appeals. Moreover, "[a]n application for a writ of habeas corpus shall be made to the appropriate district court." FED.R.APP.P. 22(a); *see Felker,* 518 U.S. at 660–61 & n. 3, 116 S.Ct. 2333 (discussing AEDPA's revision to FED.R.APP.P. 22(a)). Under the alternative holding, this Court retains jurisdiction to provide constitutionally-required habeas review of executive detention of aliens facing deportation until Congress specifically provides otherwise.

### III.

■ Finding habeas jurisdiction does not end the inquiry, however, because Lee's petition may lie outside the scope of habeas review that remains. Judgments about the scope of the writ are normally for Congress to make, *Felker,* 518 U.S. at 664, 116 S.Ct. 2333, and the question remains whether AEDPA and IIRIRA have narrowed the

---

For that view to be correct, the *Heikkila* Court and the others must have reached the question of whether they retained any residual habeas jurisdiction under the Constitution only after holding *sub silentio* that the 1917 Act and its predecessors had impliedly repealed statutory habeas jurisdiction (unless the Court cast aside the avoidance canon and decided a constitutional question when the issue could have been resolved through statutory interpretation). If that silent holding is necessary to the judgments in *Heikkila* and other decisions under the 1917 Act, then those decisions appear to be in direct conflict with *Felker* and its requirement that repeal of statutory habeas jurisdiction must be express.

On the other hand, if decisions from the *Heikkila* period were exercises in statutory habeas jurisdiction, then they cannot be relied upon as reference points for determining the scope of

constitutional habeas review, unless constitutional habeas was determined to be coextensive with § 2241 jurisdiction. Under either view, however, support is had for habeas jurisdiction over statutory claims in this case.

**21.** *See Ex parte Yerger,* 75 U.S.(8 Wall.) 85, 96, 19 L.Ed. 332 (1868) ("it is hardly supposable that, under the new government, founded on more liberal ideas and principles [than that of England], any court would be, intentionally, closed to [applicants for a writ of habeas corpus]"); *Parisi v. Davidson,* 405 U.S. 34, 48, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972) (Douglas, J., concurring in the result) (Suspension Clause "must mean that its issuance, in a proper case or controversy, is an implied power of any federal judge").

scope of § 2241 review to exclude petitions such as Lee's. To be clear, Lee raises a purely legal issue of statutory interpretation: he believes that his custody is illegal because the BIA dismissed his motion to reopen deportation proceedings on the legally mistaken belief that such claims had been retroactively extinguished by AEDPA.

### A.

■ Little difficulty is had in finding that § 2241 jurisdiction encompasses claims such as Lee's. Section 2241 restricts this Court's power to issue the writ "unless— ... [Lee] is in custody in violation of the Constitution *or laws* or treaties of the United States." 28 U.S.C. § 2241(c)(3). Courts exercising § 2241 jurisdiction to inquire into the legality of deportees' detention have frequently engaged in review of INS's statutory interpretation. *See Goncalves,* 144 F.3d at 124 (collecting cases); *Yesil,* 958 F.Supp. at 837–39; *Mojica,* 970 F.Supp. at 159–63.

■ To the extent that the Government argues that the judicial review provisions of AEDPA and IIRIRA were in fact stealth amendments to restrict § 2241 jurisdiction to constitutional questions alone, that argument is rejected. *See Jean–Baptiste,* 144 F.3d at 219 ("Nothing in the language of either the Antiterrorism Act or the Immigration Reform Act suggests that Congress expressly repealed § 2241, *limited its scope,* or eliminated the jurisdiction or the district courts under that statute to entertain petitions seeking writs of habeas corpus.") (emphasis added); *cf. Marcello,* 634 F.2d at 970–72. Although doubtful, it may be that Congress

insulated other aspects of the INS's deportation proceedings from § 2241 review, and the holding here is only that the scope of post-IIRIRA § 2241 inquiry extends to questions of the agency's generally applicable statutory interpretation.

### B.

■ With respect to the alternative holding that constitutional jurisdiction remains to entertain habeas petitions, the Attorney General argues that the Court of Appeals for this Circuit has either held or strongly suggested that the Constitution only requires habeas review of "substantial constitutional questions." *See Ramallo,* 114 F.3d at 1214. Although the opinion does allow for that inference, it does not support the weight placed on it by the Government. The *Ramallo* court decided only that it need not be concerned that IIRIRA § 306 violates Article III, which vests the "judicial power" in the courts of the United States, because the Government conceded that IIRIRA must be construed to allow federal courts to exercise the power to review for constitutional error. *Id.* No mention is made of any other constitutional provision, such as the Suspension Clause, which may require a broader scope of review than Article III standing alone. And, there is no indication that Chief Judge Edwards intended to stipulate on behalf of the court to a saving construction limited only to substantial constitutional questions. In fact, there is some indication to the contrary.[22] Therefore, *Ramallo* did not conclusively determine the scope of habeas review required by the Constitution.

---

**22.** For example, the court concluded that Ramallo *"retain[ed]* the right to pursue claims of constitutional infirmity on habeas," indicating recognition of a pre-existing right, perhaps under § 2241, that survived enactment of IIRIRA.

In addition, the Government would equate *Ramallo* with Judge Easterbrook's opinion in *Yang v. INS,* 109 F.3d 1185, 1196 (7th Cir.1997) (stating in dicta that IIRIRA repealed § 2241 jurisdiction). But *Ramallo's* reference to *Yang* was preceded by a *"cf."* cite, which, in the shorthand of our profession, indicates that the "[c]ited authority *supports a proposition different from the main proposition but sufficiently analogous to lend support."* THE BLUEBOOK· A UNIFORM SYSTEM OF CITATION 23 (16th ed.1996) (emphasis in original). At the risk of reading too much into the *"cf.,"*—

in the manner of investors on Wall Street finding substantial nuance in every remark made by the Chairman of the Federal Reserve Board—the fairest reading of *Ramallo's* citation of *Yang* is that both courts agree that IIRIRA § 306, if taken at face value, requires a saving construction that preserves constitutionally-required habeas jurisdiction at a minimum, but that the *Ramallo* court did not similarly subscribe to the finding of repeal of § 2241. Finally, whatever significance may be gleaned from the citation to *Yang* must be tempered with recognition that after our Court of Appeals decided *Ramallo,* other Seventh Circuit panels explicitly distanced themselves from the *Yang* dicta. *See Turkhan,* 123 F.3d at 490; *Chow v. INS,* 113 F.3d 659, 668–69 (7th Cir.1997).

While the issue has not been decided in this Circuit, a full discussion of the scope of constitutionally-mandated habeas jurisdiction here would lengthen this already long opinion unbearably. And, as it is needed only for the Court's alternative holding, suffice it to say that precedent and reason fully persuade me that the Constitution contemplates that courts inquiring into the legitimacy of executive detention on habeas must be available to hear claims of statutory as well as constitutional wrong.

Judicial precedent supports the view that the scope of constitutional habeas corpus jurisdiction extends to review of the executive branch's statutory interpretation. In two cases arising under the 1917 Act, arguably exercising constitutional habeas jurisdiction, the Supreme Court reviewed the INS's refusal to consider an alien's application for discretionary relief. In both, the Court inquired into whether the agency had applied the correct statutory or regulatory standards. *See United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954). A number of lower court decisions from the same period also reviewed statutory claims on habeas. *See Amicus* Mem. at 27 (collecting cases).

Indeed, *legislative* precedent also supports this view.[23] In the run-up to passage of the 1952 Act, at which point habeas review was the only access to the federal judiciary by aliens facing deportation, the Senate Judiciary Committee summarized its understanding of constitutional habeas as follows:

Once the order and warrant of deportation are issued, the administrative process is complete. Under the fifth amendment to the Constitution, the 'due process' provision, the alien may, however, petition for a writ of habeas corpus. In a habeas corpus proceeding, based on a deportation case, the court determines whether or not there has been a fair hearing, *whether or not the law has been interpreted correctly*, and whether or not there is substantial evidence to support the order of deportation.

The Immigration and Naturalization Systems of the United States, S. Rep. No. 1515, 81st Cong., 2d Sess. 28 at 629 (1950) (cited in *Pedreiro*, 349 U.S. at 56, 75 S.Ct. 591 (Minton, J., dissenting)) (emphasis added).

If these precedents alone do not compel the conclusion that constitutional habeas jurisdiction extends to all questions of law, even in the immigration context, consideration of the history of the Great Writ and the role of judicial review of executive detention in preserving the rule of law does. In their thoughtful articles, Professors Neuman and Fallon both reach the same conclusion, albeit by somewhat differing routes. *See* Neuman, *Habeas Corpus*, 98 Colum.L.Rev. at 1033–34; Fallon, *Applying the Suspension Clause*, 98 Colum.L.Rev. at 1096.

The alternative proposed by the Government and endorsed by some courts, *e.g., Mbiya v. INS*, 930 F.Supp. 609, 612 (N.D.Ga. 1996), is to incorporate the "miscarriage of justice" standard applied to successive habeas petitions by prisoners or to limit review to "substantial constitutional questions." Not only is there no support in the text or legislative history for that approach, *see Goncalves*, 144 F.3d at 124, but such application would ignore the very important differences in context.

But the proposition is problematic for a number of structural, historical and prudential reasons that can be left to the commentators to explore. Here, the point is only that, lest one get the impression that the judicial branch has been alone in defending constitutional habeas review against a persistently overreaching legislature, Congress also has shared the view that constitutional habeas review extends to questions of the executive's statutory interpretation.

---

**23.** A nice question arises as to whether courts should presume that a later congress concurs in the constitutional interpretation of a prior congress unless the later congress states otherwise. If that were the case, the Court could presume that the 104th Congress shared the views of the 81st Congress that constitutional habeas extends to questions of statutory interpretation; this would directly refute the Attorney General's argument that the 104th Congress believed that AEDPA and IIRIRA would be saved by habeas review limited only to substantial constitutional questions.

The more restrictive standard for successive post-conviction petitions by a person subject to *judicial* detention applies in part because the issues raised on habeas have been, or could have been, raised previously in a court of law, and successive collateral attacks on a final judgment undermine the value of finality of judgments, *cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), a consideration not present in the case of executive detention. On constitutional habeas review of *executive* detention, there has been no prior judicial inquiry into any questions of law, and for the Court to fulfill its judicial function, it must be available to say what the law is. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *see also* Jonathan L. Hafetz, Note, *The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts*, 107 Yale L.J. 2509, 2536–44 (1998). A final problem with the jurisdictional gerrymander proposed by the Attorney General is that it would require extensive inquiry into the merits of the case to determine whether there is jurisdiction.[24] In sum, no persuasive reason has been advanced to support a finding that the Constitution insulates all violations of federal statutes by the executive branch from judicial inquiry in habeas corpus proceedings.

## IV.

■ Having determined that the Court has subject matter jurisdiction by way of 28 U.S.C. § 2241, or in the alternative, the Constitution, the Court must also inquire into the matter of personal jurisdiction. At oral argument, counsel for both the Government and Lee appeared somewhat stunned when the Court inquired into whether there "still" was a challenge to personal jurisdiction in this case. Their surprise was no doubt due in part to the fact that nowhere in the Government's motion to dismiss for lack of subject matter jurisdiction, or elsewhere in its return to the show cause order, is there a hint that the Court lacks personal jurisdiction over the INS District Director who holds Lee in custody.

The Court's question at argument was prompted by what appears to be a change in position by the Government. When a previous habeas petition was filed in this District by an alien detained outside this jurisdiction, the Government challenged both subject matter and personal jurisdiction. As has been done here, Judge Friedman concluded that AEDPA and IIRIRA did not deprive the federal district courts of subject matter jurisdiction. *Ozoanya*, 968 F.Supp. at 6–7. But because the petitioner in that case was held in Louisiana, and under the law of this Circuit, which identifies the "custodian" of a habeas petitioner as the detainee's "warden," *see Chatman–Bey v. Thornburgh*, 864 F.2d 804, 810–811 (D.C.Cir.1988) (en banc), Judge Friedman transferred the case to the jurisdiction where the INS District Director was located. Upon arrival there, the petition was dismissed. *See Ozoanya v. Reno*, 979 F.Supp. 447, 454 (W.D.La.1997).

Under the law of this Circuit, because Lee was in custody in Virginia until very recently,[25] the Government would have had grounds for challenging this Court's personal jurisdiction over Lee's custodian. But, by failing to raise the issue in its motion or return to the show cause Order, or to appear specially, it is evident that the Government has waived any objection to this Court exercising jurisdiction over the District Director. *See Chatman–Bey*, 864 F.2d at 813 ("It is . . . elementary that a defense of . . . lack of personal . . . jurisdiction is waived unless the defense is asserted by a pre-answer motion.").

---

24. By what standard would "substantial" questions of constitutional law be measured? Would it be a question of form or substance? If it is the former, then wealthier aliens able to retain counsel to artfully plead their case would reap an unfair benefit; if it is the latter, significant judicial resources will be drawn down upon simply to determine threshold matters.

25. Lee's release does not mean that he no longer is in "custody" such that the Court is deprived of § 2241 jurisdiction. *See Mojica*, 970 F.Supp. at 164–65 (collecting cases).

## V.

■ The statutory merits of the petition can now be taken up. At the time AEDPA was enacted, Lee had pending before the BIA a motion to reopen his deportation proceedings in order to admit the additional evidence demonstrating his INS-approved marriage to a United States citizen and to allow him to apply for an adjustment of status and a § 212(c) waiver of deportation. The parties agree that AEDPA § 440(d), by its terms, makes aliens with a criminal background such as Lee's ineligible to apply for a § 212(c) waiver. *See* Susan L. Pilcher, *Justice Without a Blindfold: Criminal Proceedings and the Alien Defendant,* 50 Ark.L.Rev. 269, 287–292 (1997) (summarizing changes in availability of discretionary waivers). Thus, the critical issue is whether AEDPA § 440(d) applies retroactively to applications that were pending at the time the Act was passed.[26]

■ As with any other question of statutory interpretation, the inquiry is directed at implementing congressional intent as expressed in the statute. Congressional intent is measured against the background presumption disfavoring retroactivity. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Where Congress expresses no intent, the *Landgraf* default rule applies. A three-step process is emerging from the Supreme Court's recent retroactivity jurisprudence.

■ First, the statute is examined for an express statement regarding its temporal reach. *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. This is, in part, because where application of the statute to cases in which the events in suit occurred prior to enactment would have retroactive effect, Congress must provide an "unambiguous directive" to overcome the presumption against retroactivity. *Id.* at 263, 114 S.Ct. 1483; *LaFontant,* 135 F.3d at 161. Second, absent a clear statement, the Court should determine—by using the "normal rules of construction"—whether the statute would have retroactive effect and whether Congress expressed its intent disfavoring retroactive application. *Lindh v. Murphy,* 521 U.S. 320, ——, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). Finally, if it appears that Congress left open the question of retroactivity, then the Court should apply the judicial default rule. That is, if the statute would have retroactive effect, the presumption against retroactivity applies. *Landgraf,* 511 U.S. at 272, 114 S.Ct. 1483. In other situations, involving, for example, statutes that affect prospective relief, change procedural rules, or confer or oust jurisdiction, retroactive application is proper. *Id.* at 273–75, 114 S.Ct. 1483, *see also LaFontant,* 135 F.3d at 161–63.

In applying this process, the parties first agree that AEDPA provides no express provision governing the temporal reach of § 440(d). With respect to the second step, both believe that Congress nevertheless expressed its intent regarding retroactivity, and, not surprisingly, they come to opposing conclusions. For its part, the Government argues from the overall purpose of the statute: Congress intended to expedite removal of aliens with prior criminal convictions, and to implement that goal, it expected § 440(d) to apply to applications pending on the date of enactment. Lee, on the other hand, provides a more specific textual argument, pointing out that where Congress intended similar sections of AEDPA to apply retroactively, it said so. The textual argument is the more persuasive, and therefore the Court

---

**26.** The Government's retroactivity argument focuses solely on the effect of AEDPA § 440(d) on INA § 212(c), the same issue considered by the courts in *Goncalves* and *Mojica* among others. This is true even though Lee is situated somewhat differently than petitioners in those cases, where petitioners' § 212(c) applications had been filed or had been partially adjudicated at the time AEDPA was enacted.

The BIA limited its holding of non-retroactivity only to such cases. One member of the BIA expressed concern that AEDPA § 440(d) should not be applied retroactively to other cases in the "pipeline," including pending motions to reopen. *See In re Soriano,* Inter. Dec. 3289, 1996 WL 426888 (Rosenberg, concurring in part and dissenting in part).

There appears to be no dispute that resolution of Lee's petition requires determination only of whether AEDPA § 440(d) applies retroactively. Perhaps that is for good reason, *cf. generally Goncalves v. INS,* 6 F.3d 830 (1st Cir.1993) (Breyer, J.) (discussing extensively BIA's standard for reopening proceedings to consider § 212(c) applications).

concludes that Congress did not intend for § 440(d) to apply retroactively. Even if it did, the statute would have retroactive effect, and such intent was not stated clearly enough to overcome the presumption against retroactivity.

The text of the statute reflects that, in many instances, Congress considered whether retroactive application would be appropriate and expressly stated its view. The task here is to interpret Congress's silence with respect to § 440(d) in light of its expressions in other parts of the statute. AEDPA applies both to aliens connected with terrorist activities and aliens convicted of ordinary crimes. As the First Circuit discussed at length, §§ 413 and 421 apply to alien terrorists' ability to obtain relief from deportation, and those sections expressly provide for retroactive application. *See Goncalves,* 144 F.3d at 128–31. This Court draws the same inference as the First Circuit. Congress must have intended by its silence for § 440(d) to be applied differently.[27] Moreover, I adopt and incorporate by reference Judge Lynch's impressive exploration of the legislative history, which confirms the view, drawn from the text, that Congress did not intend for retroactive application of § 440(d). *See Goncalves,* 144 F.3d at 131–33.

█ Even if a more explicit provision were required to find that Congress expressed its intent, one way or the other, concerning retroactive application, the statute has retroactive effect as applied to Lee, and therefore resort to the default rule against retroactive application is appropriate. Admittedly, the question of retroactive effect is a close one. The quintessential statute having retroactive effect is one that "takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past ..." *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483 (quoting Justice Story's opinion in *Society for Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756, 767 (C.C.D.N.H.1814) (internal citations omitted)). That formulation, however, "does not purport to define the outer limit of retroactivity." *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, ——, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997).

On the one hand, under Justice Story's formulation, it is clear that a new "disability" has been imposed on Lee. It is true that at the time he took drunken aim at the Virginia road signs, his conduct was, and still is, criminal. Nevertheless, when he unlawfully discharged his weapon, doing so would not have rendered him deportable. That result was later provided by Congress and explicitly made retroactive. *See* Pub.L. No. 100–690 at § 7344(a); 8 U.S.C. § 1251(a)(14) (West Supp.1989). In addition, at the time of Lee's conduct, he could have applied for a § 212(c) waiver, and retroactive application of § 440(d) would "disable" him from doing so. *Cf. Goncalves,* 144 F.3d at 130 (unfair to impose "additional burdens" on prior conduct).

On the other hand, it appears that additional burdens that may yield a finding of retroactive effect when applied to United States citizens do not have the same effect when applied to aliens. For it has been held that Congress is free to alter retroactively the immigration consequences of criminal

---

**27.** *See also Mojica,* 970 F.Supp. at 173; *cf. Lindh,* 521 U.S. at ——, 117 S.Ct. at 2063 ("The statute reveals Congress's intent to apply [other sections of AEDPA] only to such cases as were filed after the statute's enactment (except where chapter 154 otherwise [provides])").

Something of a puzzle arises from § 440(f), which establishes an effective date for provisions of § 440(e). Section 440(e) significantly redefines "aggravated felony," a term which, under prior law, had the effect of making a § 212(c) waiver unavailable. Section 440(f) makes most of subsection (e) applicable to "convictions entered on or after the date of enactment of this Act," except subsection (e)(3), which is applica-

ble retroactively. One plausible inference is that Congress intended subsection (f) to confirm its intent that subsection (e), like subsection (d), would apply prospectively with only one exception, subsection (e)(3). It also is possible to infer that subsection (e)'s prospectivity provision is an exception to the rest of § 440, which Congress intended to apply retroactively.

Either interpretation is plausible, but in light of the considerations discussed in *Goncalves* regarding § 413 and § 421 along with the legislative history of § 440(d), the more persuasive view is that Congress did not intend for retroactive application of § 440(d).

conduct without such alteration being deemed impermissible. *E.g., Chow v. INS,* 113 F.3d 659, 667 (7th Cir.1997); *see also Avelar Cruz v. Reno,* 6 F.Supp.2d 744, 751–755 (N.D.Ill.1998) (discussing permissible retroactive application of 1990 legislation limiting scope of § 212(c) waivers).

In addition to balancing these considerations, the Court notes a troubling aspect of this case: the INS office that prosecuted Lee's deportation also had the power to adjudicate his Form I–130 application for approval of his marriage. That office did swiftly process the Form I–130 application, but it simultaneously pressed ahead for immediate adjudication of deportability even when it was apparent that doing so would put Lee in a far worse position than he would have been had a continuance of the deportation proceedings been granted. While this concentration of quasi-executive and quasi-judicial power in the same office does not rise to the level of a due process violation as applied to Lee, it is one of the factors that created the situation by which retroactive application of § 440(d) would impose additional burdens on Lee and his family.[28]

As the *Landgraf* Court candidly explained: "Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." 511 U.S. at 270, 114 S.Ct. 1483. Thus, if the analysis of AEDPA requires determination of whether § 440(d) would have retroactive effect, then this is one of those "hard cases." On balance, even though Lee never had a "right" to receive a § 212(c) waiver, he certainly was entitled to have the opportunity to be heard and to present his case in accordance with the agency's factors—by which it had constrained its discretion—when evaluating applications for § 212(c) waivers. The deprivation of that opportunity to be heard is a retroactive effect. Additional reasons also counsel against applying § 440(d) retroac-

tively in cases such as this. *See Avelar Cruz,* 6 F.Supp.2d at 751–755 (finding that retroactive application would nevertheless violate the Equal Protection Clause because it treats deportable and excludable aliens differently).

## VI.

The issues raised by this complex and novel case required extensive discussion, but the ultimate conclusion is fairly limited. This Court holds that Congress did not express an intent in either AEDPA or IIRIRA to repeal the long-standing grant of jurisdiction to federal district courts, 28 U.S.C. § 2241, to issue writs of habeas corpus to those detained by the United States, or in violation of the Constitution or laws of the United States. Alternatively, if Congress did intend such a repeal, this Court holds that the Constitution requires that some court, other than an administrative court created by Congress, be available to inquire on habeas into the legality of a potential deportee's detention. In the absence of a specific limitation imposed by Congress, this Court may exercise the constitutionally-required habeas jurisdiction. In either case, this Court retains jurisdiction to evaluate whether a prisoner is detained based on the INS's erroneous interpretation of a statute. Finally, this Court concludes that in this case, Lee's detention is based, in part, on the INS's erroneous determination that Congress intended AEDPA § 440(d) to apply retroactively to motions to reopen and applications for waivers of deportation provided by pre-AEDPA § 212(c) of the Immigration and Naturalization Act. Accordingly it is hereby

**ORDERED** that the Attorney General's Motion to Dismiss is DENIED with prejudice; and it is

**FURTHER ORDERED** that Lee's petition for a writ of habeas corpus is GRANTED This case is REMANDED to the Board of Immigration Appeals for consideration of Lee's appeal, motion to reopen deportation

---

**28.** Lee's counsel also suggests that the impact of retroactive application of § 440(d) on Lee's wife, a United States citizen, and the children, also citizens, should be considered when determining whether the statute would have retroactive effect. Regrettably, the current state of the law does not appear to allow for explicit weighing of the inter-

ests of these non-parties who clearly will be injured by retroactive application in this case. But this consideration is one of the bases for the default rule requiring a clear statement of retroactivity once it has been determined that the statute would have retroactive effect with respect to the party in suit.

proceedings and application for a § 212(c) waiver of deportation under the standards in place prior to AEDPA's enactment.[29]

IT IS SO ORDERED.

---

**29.** The Court expresses no opinion as to how the agency should exercise its discretion under those standards in this case.