Faustino CALDERON, Petitioner,

v.

Janet RENO, as Attorney General of the United States, Doris Meissner, as Commissioner of the Immigration & Naturalization Service, and Brian Perryman, in his capacity as District Director of the Immigration and Naturalization Service, Respondents.

No. 98 C 552.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 3, 1998.

Royal F. Berg, Chicago, IL, for Petitioner.

James G. Hoofnagle, AUSA, United States Attorney's Office, Chicago, IL, for Respondents.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Petitioner Faustino Calderon (Calderon) is an alien subject to a final order of deportation. He filed a petition for writ of

habeas corpus in this court on January 28, 1998, challenging the order as a violation of his right to due process and equal protection, and seeking release from custody. Respondents seek dismissal of the petition for lack of subject matter jurisdiction or, in the alternative, summary judgment on the petition. Petitioner has filed a cross-motion for summary judgment. For the reasons set forth below, we find that we have no subject matter jurisdiction over Calderon's claims and dismiss the petition in its entirety.

### FACTS AND PROCEDURAL HISTORY [1]

Calderon is a native and citizen of Mexico. He entered the United States as a lawful permanent resident alien in May 1972. He is married, the father of five children,[2] and the proprietor of a small trucking firm. For almost two decades now Calderon has been the subject of a series of criminal and deportation proceedings. Literally on the eve of his scheduled deportation, Calderon filed this petition for a writ of habeas corpus, seeking once again to avoid return to his native Mexico.

The events that led to Calderon's final deportation order began on March 19, 1978, when he lawfully reentered the United States, as a returning resident alien, after a brief visit to Mexico. Before leaving Mexico, however, Calderon apparently made arrangements with five individuals to provide them with transportation to Chicago, once they had illegally crossed the border, in exchange for a total of $2500. According to court records the group was apprehended by authorities when their truck broke down. On May 18, 1978, after a plea of not guilty, Calderon was convicted of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2).[3] Shortly thereafter, the Immigration and Naturalization Service (INS) commenced deportation proceedings and issued an order to show cause alleging that Calderon was deportable from the United States pursuant to 8 U.S.C. § 1251(a)(13)(1980) (alien smuggling), as an alien who, at the time of entry, or within five years of any entry, knowingly and for gain, encouraged, induced, assisted, abetted or aided another alien to enter the U.S. in violation of the law. Calderon continued to maintain his innocence and vigorously contested the charge of deportability.

On May 8, 1987, Calderon was arrested in Chicago along with a co-conspirator, Luis Perez (Perez), after the two men delivered a kilogram of cocaine to an undercover federal agent. On April 22, 1988, Calderon was convicted of several drug trafficking offenses in violation of 21

---

**1.** The facts which follow are taken from the petition, the parties' briefs and from the opinion of the Seventh Circuit in a related case. *See United States v. Perez*, 43 F.3d 1131, 1132–1133 (7th Cir.1994). The court notes that petitioner did not comply with Local Rule 12N and consequently all of the facts set forth in respondents' 12M statement are deemed admitted. Local Rule 12N(3)(b); *Midwest Imports v. Coval*, 71 F.3d 1311, 1313 (7th Cir.1995).

**2.** Calderon's wife and two of his children reside here as lawful permanent residents. The other three children are United States citizens.

**3.** Calderon was *not* convicted of § 1324(a)(1) or (a)(4). At the time of Calderon's conviction, 8 U.S.C. § 1324(a) provided that
(a) Any person... who
 (1) [*brings in* to the United States];

(2) knowing that he is in the [U.S.] in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, *transports*, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;
 (3) [*harbors*]; or
 (4) [*encourages or induces* entry] of
any alien..., not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States..., shall be *guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs....*

U.S.C. §§ 841(a)(1), 844, and 846, as well as a firearms offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(c). The INS then amended the order to show cause, adding allegations that Calderon was deportable under 8 U.S.C. § 1251(a)(2)(B)(i)(1994), as an alien convicted of a controlled substance violation, and under 8 U.S.C. § 1251(a)(2)(C)(1994), as an alien convicted of a firearms offense. Calderon presented no evidence to dispute the firearms and controlled substance counts and, on November 28, 1995, the immigration judge entered a finding as to Calderon's deportability, based on these two grounds.

At this point, absent a finding of deportability on the alien smuggling charge, Calderon would still have been eligible under the Immigration and Nationality Act (INA)[4] for an adjustment of status under § 245(a)[5] and for a waiver of deportability under 212(c).[6] *See Matter of Gabryelsky*, 20 I. & N. Dec. 750 (BIA 1993).[7] The smuggling count, therefore, became the pivotal issue in Calderon's case before the immigration judge.

Because Calderon's 1978 conviction was for "transportation" and not for "bringing in" or "encouraging entry," the INS' *prima facie* case relied heavily on sworn statements to the INS from the five aliens transported by Calderon. Calderon's lawyers objected to the consideration of the affidavits for several reasons. First, they were now almost seventeen years old and, since 1979, the INS had been unsuccessful in its attempts to locate the affiants or corroborate the testimony. Second, the affidavits were prepared in English, without the use of an interpreter, even though the statements were given in Spanish. Third, none of the affidavits identified "Faustino Calderon" or identified the physical attributes of the man they referred to as "Faustino." Finally, Calderon's counsel noted that the affidavits were "suspiciously similar in wording" and that two were "virtually word for word similar" (R. at 19).

After an extensive review of both the record of the immigration proceedings and the record from the criminal trial, the immigration judge concluded that the INS had met its burden of proving deportabili-

4. Immigration and Nationality Act of 1952, Pub.L. No. 82–414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.). Under the Act, statutory grounds for deportability or exclusion are not discretionary. The required discretion is instead provided by the provisions allowing an adjustment of status or a waiver of grounds of inadmissibility or deportability, so long as certain criteria are met.

5. Section 245(a) of the INA, codified at 8 U.S.C. § 1255(a), allows an alien, properly admitted as a permanent resident but later found deportable, to apply for an adjustment of status to lawful permanent resident. If discretion is exercised in the alien's favor, "the [alien] will no longer be deportable on the basis of the prior conviction." *Matter of Rainford*, Int. Dec. 3191, 1992 WL 323809, *4 (B.I.A. Sept. 9, 1992).

6. Section 212(c) of the INA, codified at 8 U.S.C. § 1182(c) (repealed Sept. 30, 1996) (*see* successor provision at § 1182(h)), allows an alien to eliminate a ground of inadmissibility upon application to enter the United States. The provision has also been interpreted, however, to include availability for relief in deportation proceedings where the alien

has not departed from the U.S. subsequent to the acts that rendered him excludable. *Matter of Gabryelsky*, 20 I. & N. Dec. 750 (1993); *Variamparambil v. INS*, 831 F.2d 1362, 1364 n. 1 (7th Cir.1987).

7. In *Gabryelsky*, the Board of Immigration Appeals confirmed that aliens could simultaneously apply for a waiver of deportation under 212(c) in conjunction with an adjustment of status under 245. In other words, aliens can "bootstrap" one form of relief into eligibility for the other. Thus, while Calderon's firearms violation would have made him ineligible for relief under section 212(c), it would not have precluded a showing of admissibility under § 245(a) because the firearms conviction was not also a ground for exclusion. *Gabryelsky*, 20 I. & N. Dec. at 753; *Snajder v. INS*, 29 F.3d 1203, 1208 (7th Cir. 1994). If Calderon was granted the adjustment of status under 245(a) to take care of the firearms ground, then he could use 212(c) to waive deportability based on the remaining substance abuse charge. *See Gabryelsky*, 20 I. & N. Dec. at 754.

ty on the alien smuggling charge by the requisite "clear, convincing and unequivocal evidence." He found that, in fact, Calderon had entered the United States on March 19 or 20, 1978, after having made arrangements to either encourage or induce illegal aliens to enter the United States for gain. In his oral decision, the judge noted that "but for the transcript of proceedings in the underlying criminal case ... there might be some merit to the respondent's arguments" regarding the affidavits' deficiencies. To bolster his finding, therefore, the judge provided a detailed inventory of testimony from the trial record which closely tracked each affiant's statement to the INS. He then concluded simply and without elaboration that Calderon was ineligible for any adjustment of status or waiver of deportability under 212(c) and ordered him deported.[8]

On December 6, 1995, Calderon appealed the decision to the Board of Immigration Appeals (BIA). His notice of appeal identified only the immigration judge's finding on the smuggling charge as the reason for the appeal. On July 25, 1997, the BIA dismissed Calderon's appeal, agreeing with "the well-reasoned and thorough decision" of the immigration judge that deportability "on the charge of smuggling for gain, as well as the other charges" had been established. The Board did not discuss the judge's conclusion that Calderon was ineligible for waiver or adjustment of status.

In the meantime, Calderon and Perez were both serving their sentences for the cocaine and weapons charges in the federal corrections system. After several transfers, the two men ended up as cellmates at FCI–Oxford. Around January 1993, Perez apparently became aware that Calderon had assisted the government with several drug prosecutions, including providing testimony against one of Perez' family members. He also reportedly blamed Calderon for his thirteen-year sentence and his lost $25,000 in cocaine. *Perez*, 43 F.3d at 1132. On January 13, 1993, Perez attacked Calderon with a razor blade—slicing his face, neck and shoulders—and then walked into the officer station to report the incident. The injuries almost killed Calderon, cut off part of his ear, and required more than 100 stitches to sew up his neck. Calderon testified at Perez' trial and a jury found his former cellmate guilty of assault with intent to commit murder and of possession of a prohibited object intended as a weapon. After the Seventh Circuit overturned the conviction based on faulty jury instructions, *United States v. Perez*, 43 F.3d 1131 (1994), the government reindicted Perez, adding a new count of "assault resulting in serious bodily injury." Calderon testified once again and the Seventh Circuit upheld Perez' subsequent conviction on the lesser charge. *United States v. Perez*, 79 F.3d 79, *cert. denied*, 519 U.S. 856, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996).

On October 21, 1997, Calderon filed an application for a stay of his deportation in order to liquidate his trucking business. His accompanying declaration claimed that because his firm's semi-trucks were secured by mortgages on Calderon's house and rental property his wife—who was to remain in the United States—would be at risk of losing her home and sole source of income. The INS granted Calderon's application and stayed his deportation to

8. The November 28, 1995 opinion and order issued by the immigration judge concluded with the following:

"I would order that the respondent is ineligible for adjustment of status, 212(c) relief, and I would find that termination is appropriate. I would designate Mexico as the country in the event that deportation is going to be required pursuant to Section 243(a) of the Act and I would issue the following order:

*ORDER*

IT IS ORDERED that the respondent's request for any and all forms of relief be denied.

IT IS FURTHER ORDERED that the respondent be ordered deported from the United States to Mexico on the charge contained in the Order to Show Cause."

January 29, 1998. This petition for a writ of habeas corpus was filed on January 28.

Petitioner now claims that if he returns to Mexico, family and "co-horts" of Perez will kill him in retaliation for his testimony. His deportation, he concludes, would violate the U.N. Convention Against Torture. *See infra* at 952 n. 33. Calderon further claims that his right to equal protection and due process was violated when the immigration judge ordered him deported and ineligible for relief, and when the Board of Immigration Appeals affirmed the decision without elaboration.

## LEGISLATIVE BACKGROUND

After Calderon filed his appeal with the BIA, but before the Board took any action, Congress passed two pieces of legislation which significantly amended the structure and substance of the Immigration and Nationality Act. After several earlier efforts to speed the deportation of aliens convicted of crimes,[9] Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L.No. 104–132, 110 Stat. 1214 (codified throughout U.S.C.), hoping to eliminate various avenues for judicial review available to prisoners and criminal aliens. Before the AEDPA was signed into law by President Clinton on April 24, 1996, section 106 of the INA, codified at § 1105a(a)(10), had provided that aliens in detention pursuant to a deportation order were entitled to habeas corpus review in the district courts, thereby creating an exception to the general rule granting exclusive jurisdiction in deportation matters to U.S. courts of appeals. Sections 401(e) and 440(a) of the AEDPA repealed § 1105a(a)(10) and replaced it with a new provision providing that final orders of deportation would not be "reviewable" for any alien who is "deportable" for having committed certain criminal offenses.[10]

Five months later, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[11] as part of its omnibus appropriations act for the 1997 fiscal year. IIRIRA went much further than the AEDPA in restructuring the framework for immigration proceedings, changing even the terminology governing this already complex area of the law. The legislation created a new umbrella category of "removal" proceedings to replace the separate regimes for "deportation" and "exclusion."[12] After April 1, 1997, a foreign national who has been "admitted" will be charged with "deportability" under INA § 237(a), while a person who has not been admitted will be charged with "inadmissibility" under INA § 212(a).[13]

More importantly for our purposes here, IIRIRA repealed 8 U.S.C. § 1105a and

9. The measures included repeated amendments to broaden the scope of the term "aggravated felony" at 8 U.S.C. § 1101(a)(43) and the streamlined administrative deportation procedures established by Pub.L. 103–322, § 130,004, 108 Stat.2026, 2026–28 (1994) (codified at 8 U.S.C. § 1105a(d) (1994) (repealed 1996). *See* Gerald Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L.R. 961, 965 (1998).

10. § 1105a(a)(10) (as amended by Pub.L. 104–208, §§ 306(d), 308(g)(10)(H), and 671(c)) reads:

(10) Final Orders of deportation not reviewable.

[A]ny final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section covered in section 12[27](a)(2)(A)(iii)[ag-

gravated felony], (B)[controlled substance], (C) [firearm offenses] or (D)[miscellaneous crimes] of this title, or any offense covered by section 1227(a)(2)(A)(ii) [multiple criminal convictions] of this title for which both predicate offenses, without regard to the date of their commission, otherwise are covered by section 1227(a)(2)(A)(i) [crimes of moral turpitude for which a sentence longer than 1 year may be imposed] of this title, shall not be subject to review by any court.

11. Pub.L.No. 104–208, Div. C, 110 Stat. 3009, 3009–546 (codified in scattered sections of 8 U.S.C.) (enacted September 30, 1996).

12. *See* Ellen G. Vost, *Entry Issues*, 30th Annual Immigration and Naturalization Institute 1997, 1021 PLI/Corp 359, 366–368 (1997).

13. *Id.*

created a new regime governing Judicial Review of Orders of Removal, codified at 8 U.S.C. § 1252. The new provisions expanded AEDPA's denial of judicial review beyond deportation orders for criminal aliens, to preclude review for aliens who were now *removable* because of past criminal offenses, even if the deportation order was not based on those grounds.[14] IIRIRA § 306(a)(2), codified at 8 U.S.C. § 1252(a)(2)(B), also precludes judicial review of decisions on most forms of discretionary relief, regardless of whether the alien was being removed on criminal grounds. *See also* § 1182(h)(final sentence). The real heart of the new regime, however, is found in IIRIRA § 306(a)(2), amending 8 U.S.C. § 1252(g) to read:

(g) EXCLUSIVE JURISDICTION. Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

This provision is at the center of respondents' motion to dismiss.

### DISCUSSION

Calderon asserts that this court has jurisdiction over his petition for a writ of habeas corpus under Article I, § 9 of the United States Constitution, under the general grant of habeas corpus jurisdiction found in 28 U.S.C. § 2241, and under the All Writs Act, 28 U.S.C. § 1651. As a threshold matter, respondents argue that this court has no subject matter jurisdiction over Calderon's petition and contend that the petition must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). They make three arguments. First, respondents suggest that 8 U.S.C. § 1252(g) applies to Calderon's petition and precludes any judicial review of any of Calderon's claims because they arise out of the Attorney General's adjudication of his case as well as her efforts to execute the resulting deportation order. Second, respondents maintain that any claim of error regarding the denial of discretionary relief was waived by Calderon when he failed to raise this issue in his appeal to the BIA. His failure to exhaust administrative remedies, respondents argue, deprives this court of subject matter jurisdiction. Finally, respondents submit that Calderon's claims under the Convention Against Torture are not within the court's jurisdiction because Congress expressly declined to make the treaty self-executing. We consider each of these arguments in turn.

### I. *Availability of Habeas Corpus Jurisdiction After 1996 Immigration Reforms*

Respondents contend that the sweeping prohibition of judicial review found in § 1252(g) precludes any review by this court of Calderon's petition for habeas corpus. They point to *Lalani v. Perryman,* 105 F.3d 334, 336 (7th Cir.1997), which held that § 1252(g) took effect April 1, 1997, and to *Yang v. INS,* which held that the provision precludes even review under § 2241, "leaving only the constitutional writ, unaided by statute." 109 F.3d 1185, 1195 (7th Cir.1997), *cert. denied sub nom, Katsoulis v. INS,* — U.S. —, 118 S.Ct. 624, 139 L.Ed.2d 605 (1997). However, as respondents concede in a footnote, Congress also included in IIRIRA a specific provision denying judicial review of criminal deportation orders,[15] exempted that

**14.** 8 U.S.C. § 1252(a)(2)(C).

**15.** Codified as amended at 8 U.S.C. § 1252(a)(2)(C), the provision provides

(C) Orders against criminal aliens.

Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) [criminal & related grounds] or 1227(a)(2)(A)(iii) [aggravated felony], (B) [controlled substance], (C) [firearm offenses], (D) [misc. crimes] of this title, or any offense covered by 1227(a)(2)(A)(ii) [multiple criminal

provision from the general effective date of the statute [16] and established a transitional regime governing review of deportation orders issued in cases pending on April 1, 1997.[17]

The Seventh Circuit has been clear that the transitional rules apply to cases like Calderon's where the deportation proceedings were begun before IIRIRA's effective date and where the order of deportation became final more than 30 days after September 30, 1996. *See Turkhan v. INS*, 123 F.3d 487, 489 (7th Cir. 1997) ("Section 309 of the IIRIRA makes these new judicial review provisions inapplicable to aliens who are in deportation proceedings [before] April 1, 1997"); *Asani v. INS*, 154 F.3d 719, 719 n. 1 (7th Cir.1998) ("because Asani was in deportation proceedings prior to the April 1, 1997 effective date of the Act, the IIRIRA does not apply to Asani's petition for review and § 1105[a](a) continues to be the appropriate standard of review"); *Yang v. INS*, 109 F.3d 1185, 1191 (7th Cir.1997); *Goncalves v. Reno*, 144 F.3d 110 (1st Cir.1998) ("As made clear by the technical amendments, the new permanent rules under the IIRIRA are effective for cases in which the INS instituted removal proceedings on or after April 1, 1997. [citation omitted] In contrast, the transitional rules are to be applied to deportation proceedings which were commenced before April 1, 1997"); *Avelar Cruz v. Reno*, 6 F.Supp.2d 744 (N.D.Ill.1998). Calderon's deportation proceedings commenced in 1980 and his deportation order became final when the BIA dismissed his appeal on July 25, 1997. Thus Calderon is covered by the transitional regime established by IIRIRA § 309(c). The transitional regime consists of the rules established by IIRIRA

convictions] for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 1227(a)(2)(A)(i) [crimes of moral turpitude for which a sentence longer than one year may be imposed.]

**16.** In general, the effective date of IIRIRA's amendments is "the first day of the first month beginning more than 180 days after the date of enactment [September 30, 1996]" or April 1, 1997. *See* IIRIRA § 309(a), found at 8 U.S.C. § 1101 (History); *Avelar Cruz*, 6 F.Supp.2d at 748–49.

**17.** Found at 8 U.S.C. § 1101 (History), IIRIRA § 309(c) provides in relevant part

(c) Transition for aliens in proceedings.—

(1) General rule that new rules do not apply.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings before the title III–A effective date [April 1, 1997]—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(4) Transitional changes in judicial review.—In the case in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act [Sept. 30, 1996], notwithstanding any provision of section 106 of the Immigration and Nationality Act [8 U.S.C. § 1105a] (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section [1105a] shall not apply [providing for exclusive review through habeas corpus for detained criminal aliens] and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(E) there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act);

... and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commis-

309(c)(4)[18] and, where the provisions do not conflict, the "old rules" found in § 8 U.S.C. § 1105a. *See* § 309(c)(1). Because the AEDPA became effective immediately upon enactment, the amended version of 1105a(a)(10) is applicable.[19] *See Yang,* 109 F.3d at 1190; *Turkhan,* 123 F.3d at 489. The "permanent rules" of the new regime, including 8 U.S.C. §§ 1252(a)(2)(C)[20] and 1252(g),[21] do not apply to Calderon.

■ So what do these transitional provisions tell us about our jurisdiction to entertain habeas petitions which collaterally attack INS procedures and the conclusions reached by immigration officials? Specifically, did Congress intend to completely eliminate statutory habeas corpus jurisdiction for cases covered by the transitional regime? If so, does the Suspension Clause of the United States Constitution prohibit the repeal of habeas corpus review for criminal aliens?[22] The only three circuit courts to address these questions have determined that district court jurisdiction over original petitions for writ of habeas corpus filed pursuant to § 2241 was not eliminated for cases governed by the transitional regime. *See Goncalves v. Reno,* 144 F.3d 110 (1st Cir.1998); *Henderson v. INS,* 157 F.3d 106, 1998 WL 665783 (2d Cir.)); *Magana–Pizano v. INS,* 152 F.3d 1213 (9th Cir.1998); *but see Hose v. INS,* 141 F.3d 932, 936 n. 3 (9th Cir. April 1998) (concluding that district court jurisdiction under § 2241 was eliminated for aliens with access to direct review in the courts of appeals, but expressing no opinion on whether the statute violates the Suspension Clause as to aliens who consequently have no avenue of judicial review). Because we agree, we find it unnecessary to delve into the protections afforded by the Suspension Clause. *See Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (interpreting statute to avoid serious constitutional concerns presented where statutory provisions appeared to foreclose review of constitutional claims by an Article III court).

■ Congress must speak explicitly if it is to repeal habeas jurisdiction. *Ex Parte Yerger,* 75 U.S. (8 Wall) 85, 101, 105–106, 19 L.Ed. 332 (1868) (recognizing the constitutional guarantee of protection from unlawful imprisonment and rejecting interpretation of statute that would repeal by implication the Court's authority to issue writs of habeas corpus). In *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), the Supreme Court upheld the constitutionality of an AEDPA provision restricting the availability of successive habeas petitions because the statute did not eliminate the Court's jurisdiction to entertain habeas petitions filed as *original* matters. Reaffirming the principle announced in *Yerger,* the Court noted that Title I of the AEDPA did not mention the Court's jurisdiction over *original* habeas petitions under 28 U.S.C. §§ 2241 or 2254, whereas section 103 of the Act explicitly amended the Federal Rules of Appellate Procedure to bar consideration of habeas petitions in the courts of appeals. Because Congress clearly knew how to eliminate jurisdiction when it wanted to, the omission of an explicit reference to § 2241 in Title I evidenced a congressional desire for continued jurisdiction over original habeas petitions.

In *Goncalves v. Reno,* the First Circuit applied the Court's logic to determine whether Congress intended to preclude statutory habeas review under IIRIRA's transitional regime. Noting that IIRIRA was enacted by Congress after the Supreme Court's decision in *Felker,* the court observed that "Had Congress wished to

---

sion, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

**18.** *See supra* at 950 n. 17.

**19.** *See supra* at 947 n. 10.

**20.** *See supra* at 949 n. 15.

**21.** *See supra* at 9.

**22.** U.S. Const. art. I, § 949, cl. 2. The Suspension Clause provides that "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

eliminate any possible habeas jurisdiction under 28 U.S.C. § 2241, it could easily have inserted an explicit reference, but it did not." *Goncalves*, 144 F.3d at 121. The court rejected the argument by Attorney General Reno that AEDPA's revision of INA § 106(a)(10) [8 U.S.C. § 1105a(a)(10)] eliminated "not only the prior authorization for the exercise of habeas jurisdiction (in addition to APA review) in old INA § 106(a)(10), but also the basic grant of habeas jurisdiction contained in 28 U.S.C. § 2241." The court explained that the old version made it clear "that aliens with access to the ordinary judicial review processes could *also* seek habeas review if they were in custody." *Id.* (emphasis added). But since aliens without other recourse had traditionally been able to obtain review by habeas corpus, even in the face of statutory language precluding all other review,[23] the repeal of old 106(a)(10)was consistent with the general purpose of the AEDPA to streamline review procedures and abolish duplicative judicial remedies. It did not, the First Circuit concluded, reflect a congressional intent to eliminate statutory habeas review altogether. "Congress was well aware of the need for specific language if it wished to impair the Great Writ." *Id.* at 122.

Writing for the Second Circuit in *Henderson v. INS*, 157 F.3d 106, (2d Cir.), Judge Calabresi reached the same conclusion and affirmed the exercise of jurisdiction under § 2241 by district court judges in *Yesil v. Reno*, 958 F.Supp. 828, 836 (S.D.N.Y.1997), and *Mojica v. Reno*, 970 F.Supp. 130, 182 (E.D.N.Y.1997). The court cited its previous decision in *Jean–Baptiste v. Reno*, 144 F.3d 212, 220 (2d Cir.1998), which concluded that while the 1996 amendments had eliminated the jurisdiction "a court of appeals formerly had over petitions for review filed by aliens convicted of [certain criminal offenses]," the repeal of jurisdiction "suffers from no constitutional infirmity because the courts retain habeas jurisdiction under 28 U.S.C.

§ 2241." *See also Turkhan v. INS*, 123 F.3d 487, 489–90 (7th Cir.1997); Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L.Rev. 1362, 1397 (1953) (exploring perimeter of Congress' power to repeal federal court jurisdiction). Judge Calabresi concluded that habeas review was available in the district courts not only for "substantial" constitutional claims, but also for statutory claims "affecting the substantial rights of aliens of the sort that the courts have regularly enforced—in the face of statutes seeking to limit judicial jurisdiction to the fullest extent constitutionally possible." *Henderson*, 157 F.3d at 121.

█ The continued existence of habeas corpus jurisdiction is also suggested by the provisions of the transitional regime. IIRIRA § 309(c)(4) establishes that 8 U.S.C. § 1105a(b) shall not apply to judicial review of a final order of exclusion governed by the transitional regime, but 1105a(a) and 1105a(c) shall apply, in the same manner as they apply to judicial review of orders of deportation. Section 1105a(a) provides that the procedures of Chapter 158 of Title 28 governing judicial review of administrative agency actions shall be the exclusive procedure for judicial review of orders of deportation. Section 1105a(b) provided for exclusive review through habeas corpus for detained criminal aliens subject to an order of exclusion. Section 1105a(c), *see infra* at 953, requires aliens to exhaust available administrative remedies before any court may review an order of deportation or exclusion. It also states that "Every petition for review *or for habeas corpus* shall state whether the validity of the order has been upheld in any prior judicial proceeding," and establishes the circumstances in which a petition for habeas corpus may be used to challenge an order where the validity of the order has been previously determined in a prior civil or criminal proceeding. *Id.* (emphasis added). Thus, the two active provisions,

---

**23.** *See Heikkila v. Barber*, 345 U.S. 229, 233– 35, 73 S.Ct. 603, 97 L.Ed. 972 (1953).

(a) and (c), together with the elimination of (b), operate to make the procedures for review uniform, regardless of whether the final order is one of exclusion or deportation. This is consistent with IIRIRA's new "removal" architecture. Additionally, for those cases already pending as of IIRIRA's enactment date, the transition scheme perpetuates a system of judicial review consisting of direct review in the courts of appeals and collateral review for aliens in custody via petitions for habeas corpus under the AEDPA's streamlined procedures. It is also worth noting that IIRIRA gave the Attorney General the option to terminate a case covered by the transitional regime and to reinitiate proceedings under the new permanent rules. See IIRIRA 309(c)(3), found at 8 U.S.C. § 1101 (history). Respondents' interpretation of 242(g)'s effective date and the scope of cases to which the provision applies would render these procedures completely superfluous. A court is to give effect to all statutory provisions whenever possible. See In re Lifschultz Fast Freight Corp., 63 F.3d 621, 628 (7th Cir.1995). Our conclusion that the transitional regime did not include a repeal of statutory habeas jurisdiction does just that.

In this district Judge Conlon further noted that the text of § 309(c)(4)(G) in the transitional regime closely mirrors § 1252(a)(2)(c) with one important difference: the transitional rule precludes an "appeal" in the case of an alien inadmissible or deportable by reason of having committed a covered criminal offense, while the permanent rule precludes "review" of

any final order of removal against an alien who is removable by having committed a covered criminal offense. Avelar Cruz v. Reno, 6 F.Supp.2d 744, 750 (N.D.Ill.1998). Courts must assume that this discrepancy was intentional and that Congress chose to use the more narrow term "appeal" so as not to foreclose collateral review. Judge Conlon's conclusion that the court, therefore, retained jurisdiction under § 2241 is consistent not only with Goncalves and Henderson,[24] but also with a growing majority of district courts across the country. See, e.g., Thompson v. Perryman, 1998 WL 473471, at *6 (N.D.Ill.); Gutierrez–Martinez v. Reno, 989 F.Supp. 1205 (N.D.Ga.1998); Lee v. Reno, 15 F.Supp.2d 26 (D.D.C.1998); Morisath v. Smith, 988 F.Supp. 1333 (W.D.Wash.1997); Sandoval v. Reno, 1997 WL 839465, at *6–7 (E.D.Pa.); Sabino v. Reno, 8 F.Supp.2d 622, 636 (S.D.Texas 1998).

We conclude that neither the AEDPA nor the IIRIRA eliminated this court's jurisdiction under 28 U.S.C. § 2241 to consider petitions for habeas corpus filed by aliens subject to a final order of deportation, even where they are deportable based on the criminal violations enumerated in IIRIRA 309(c)(4)(G). Were it not for our conclusions regarding respondents' second and third arguments, we would need to consider whether the immigration reforms have narrowed the scope of review available under § 2241. While there is near consensus that colorable constitutional claims must be given access to a judicial forum,[25] Calderon's claims of procedural

---

**24.** In Magana–Pizano, 152 F.3d at 1221, the 9th Circuit held that the district court retains jurisdiction under 28 U.S.C. § 2241 only when the petitioner has no other remedy. Its per curiam decision was not based on a construction of IIRIRA which contemplated habeas review under the transitional regime. Instead, the court found that the provisions divesting federal courts of jurisdiction to review aliens' claims, § 309(c)(4)(G) and § 242(g), were unconstitutional insofar as they denied habeas relief in cases where there was no other avenue for judicial review. "Although we are mindful of our obligation to

interpret the statute in a manner that renders it constitutionally valid, (citation omitted), Hose's statutory construction [that 242(g) applies retroactively to pending cases] is binding upon us, even if we were inclined to interpret IIRIRA in a way that passes constitutional muster." Id. at 1220.

**25.** See Note, The Avoidance of Constitutional Questions and the Preservation of Judicial Review: Federal Court Treatment of the New Habeas Provisions, 111 Harv. L.Rev. 1578, 1584 (April 1998) (discussing cases). Even the government has conceded in many cases that

error and abuse of discretion are not obviously within the scope of permissible review.[26]

## II. *Calderon's Ineligibility for Discretionary Relief and Failure to Exhaust*

■ Calderon now contends that his right to due process was violated when the immigration judge denied relief from deportation without explanation and when the BIA affirmed that decision, again without elaboration. He also appears to suggest that the judge inadequately considered Calderon's testimony as a government witness as a factor weighing in favor of relief. *See Matter of Marin,* 16 I. & N.Dec. 581, 585 (BIA 1978). Respondents submit that because Calderon did not appeal the judge's denial of discretionary relief to the BIA this court has no subject matter jurisdiction over Calderon's claims.

■ The exhaustion requirement that applies in immigration proceedings, 8 U.S.C. § 1105a(c),[27] bars consideration of arguments not raised before the BIA. *See Castaneda–Suarez v. INS,* 993 F.2d 142, 144 (7th Cir.1993); *Rivera–Zurita v. INS,* 946 F.2d 118, 120 n. 2 (10th Cir.1991) ("The failure to raise an issue on appeal to the Board [of Immigration Appeals] constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of Appeals of jurisdiction to hear the matter."). Although an

exception exists for constitutional challenges to INS procedures because the administrative tribunal would not have jurisdiction to resolve those claims, a petitioner cannot obtain review of procedural errors not raised before the BIA merely by framing them as due process violations. *See Ravindran v. INS,* 976 F.2d 754, 762–63 (1st Cir.1992); *Castaneda–Suarez,* 993 F.2d at 144.

Calderon filed his notice of appeal to the Board of Immigration Appeals on December 6, 1995. Question 2 on the application asked the appellant to "[s]pecify reasons for this appeal," and then states that "If the factual or legal basis for the appeal is not sufficiently described the appeal may be summarily dismissed." Calderon's answer indicated only that "The Immigration Judge, in his decision, incorrectly found that the respondent was deportable on the charge under Section 241(a)(13) of the [INA]," and asserted that the evidence did not establish that Calderon assisted illegal aliens to enter the U.S. or that any assistance was for gain. No mention was made of the immigration judge's determination that Calderon was ineligible for relief or an adjustment of status. No oral argument was requested. Although the box on Calderon's notice of appeal indicates a separate brief was to be filed, there is no evidence that one was actually submitted.

■ Calderon has not identified any case law to suggest that by appealing the

---

some limited jurisdiction remains in the courts of appeals to review "substantial constitutional errors." *See, e.g., Ramallo v. Reno,* 114 F.3d 1210, 1214 (D.C.Cir.1997) ("[A]s the Government concedes, habeas review remains available to appellee to raise substantial constitutional questions."); *petition for cert. filed,* 66 USLW 3264 (Sept. 24, 1997) (No. 97–526); *Lee,* 15 F.Supp.2d at 37.

**26.** *See* Note, *The Proper Scope of Habeas Corpus Review in Civil Removal Proceedings,* 73 Wash. L.Rev. 459 (April 1998).

**27.** Section 106(c) of the INA, codified at 8 U.S.C. § 1105a(c) and specifically included in the transitional regime, provides in relevant part

(c) Exhaustion of administrative remedies or departure from United States; . . .

An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order . . . No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceedings, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order.

finding of deportability he has preserved the issue of relief. In *Matter of Valencia*, 19 I. & N. Dec. 354, 1986 WL 67713 (Feb. 14, 1986), the BIA sought to clarify its own regulations regarding summary dismissal where "the party concerned fails to specify the reasons for his appeal on Form I–290A (Notice of Appeal)."[28] "It is... insufficient," the Board held, "to merely assert that the immigration judge improperly found that deportability had been established or denied an application for relief from deportation.... Where eligibility for discretionary relief is at issue, it should be stated whether the error relates to grounds of statutory eligibility or to the exercise of discretion." *Id.* at 355, 1986 WL 67713. (citation omitted). Thus, under this standard, Calderon was required to specify why the finding of deportability was erroneous *and* why a finding of ineligibility for discretionary relief based on the deportability finding was also in error. Nowhere in Calderon's notice of appeal to the BIA does he refer to a denial of discretionary relief, nor is there evidence that Calderon followed through on his stated intention to provide a written brief. It is not surprising, therefore, that the BIA's

opinion did not address this aspect of the immigration judge's decision.

Moreover, even if Calderon had exhausted his administrative remedies, the brevity of the immigration judge's conclusion is undoubtedly due to the fact that all parties present at the hearing apparently understood that a finding of "alien smuggling" made Calderon ineligible for relief *under the Pre–AEDPA version* of 8 U.S.C. 1182(c).[29][30] Even before 1996, discretionary relief was unavailable for an alien convicted of one or more aggravated felonies who had served a term of imprisonment of at least five years. *See Matter of Gomez–Giraldo*, 20 I. & N. Dec. 957, 958 (BIA 1995). Calderon's convictions for alien smuggling and drug trafficking offenses were both aggravated felonies. *See* 8 U.S.C. § 1101(a)(43)(B), (N).[31] Judge Williams sentenced Calderon in 1988 to three terms of five years to run concurrently (R. at 81), and it appears that he did in fact serve five years. Thus, even if we assume Calderon appropriately exhausted his administrative remedies, he was ineligible for discretionary relief.[32]

28. *See* 8 C.F.R. § 3.1(d)(1–a).

29. Before presenting his analysis of the affidavits and trial court record, the IJ advised the parties that "My understanding is that if he— if it is determined that he has been shown to have aided and abetted an alien to unlawfully enter the United States for gain within five years of entry, then he would not be eligible for any—any form of relief." There is no indication that Calderon's attorney disagreed with this assessment.

30. Thus, this case is distinguishable from *Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998), in which the First Circuit remanded the case to the BIA even though the pro se petitioner did not raise the issue of the retrospective application of AEDPA amendments to his request for discretionary relief. There, the immigration judge had denied, on the merits, an alien's pre-AEDPA application for § 212(c) relief. In March 1997, the BIA dismissed the appeal on the grounds that, after the AEDPA, the applicant was *no longer eligible* for 212(c) relief. Thus, the BIA did not reach the merits of Goncalves' waiver request. The court of appeals reversed the dis-

trict court's affirmance and granted the petition for a writ of habeas corpus, concluding that the AEDPA amendments to § 212(c) were inapplicable to applications pending as of the AEDPA's enactment date. Specifically, the case was remanded to the BIA for consideration, on the merits, of the applicant's request for relief under the pre-amendment version of 212(c). Although Calderon falls into the window of pending cases just like Goncalves, the outcome of Calderon's case was not affected by the 1996 reforms.

31. Prior to the AEDPA amendments, § 1101(a)(43)(N) read as follows:

(43) The term "aggravated felony" means -
(N) an offense described in section 1324(a)(1) of this title (relating to alien smuggling) for the purpose of commercial advantage.

32. There is a difference between a finding of ineligibility for relief and a discretionary decision to deny relief to an ineligible alien. *See Goncalves*, 144 F.3d at 114. The standards for an immigration judge's behavior contained in *Matter of Marin* apply to the latter.

III. *Jurisdiction over Claims Arising under the U.N. Convention Against Torture*

 Calderon believes that his life will be in jeopardy if he returns to Mexico. He fears that allies of Luis Perez will seek violent retribution for his assistance to U.S. prosecutors and drug enforcement officials. Accordingly, he asks this court to provide relief from deportation under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture) [33] which provides that "No State Party shall expel, return (*'refouler'*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture, art. III, sect.1. Respondents contend, *inter alia,* that this court has no jurisdiction over claims arising under the Convention Against Torture because the treaty was not intended to be self-executing.[34]

 Treaties made by the United States are the law of the land, U.S. Const. art. VI, but if not implemented by appropriate legislation they do not provide the basis for a private lawsuit unless they are intended to be self-executing. *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J. concurring), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Whether a treaty is self-executing is an issue for judicial interpretation, Restatement (Second) of Foreign Relations law of the United States, § 154(1) (1965), and courts will consider several factors in discerning the intent of the parties to the agreement. *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373 (7th Cir.1985) (listing factors). However, if the parties' intent is clear from the treaty's language, courts will not inquire into the remaining factors. *Id.*

The legislative and executive statements attendant to U.S. ratification of the Convention Against Torture make clear that the United States did not intend the provisions of the treaty to be self-executing. In his Letter of Submittal to the President,[35] Secretary of State George Schultz included a section entitled "Declaration Regarding the Non–Self–Executing Nature of the Convention," which reads as follows:

Although the terms of the Convention, with the suggested reservations and understandings, are consonant with U.S. law, it is nevertheless preferable to leave any further implementation that may be desired to the domestic legislative and judicial process. The following declaration is therefore recommended, to clarify that the provisions of the Convention would not of themselves become effective as domestic law:

'The United States declares that the provisions of Articles 1 through 16 of the Convention are not self-executing.'

The United States Senate subsequently adopted this view and incorporated the statement as III(1) in its Resolution of Advise and Consent to the Ratification of the Convention, 136 Cong. Rec. S17486 (Oct. 27, 1990).

These express limitations by the United States are supported by the language of

---

**33.** Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *adopted by unanimous agreement of the United Nations General Assembly,* G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (Dec. 10, 1984), *entered into force as to the United States,* 23 I.L.M. 1027 (Nov. 20,1984), *modified in* 24 I.L.M. 535 (1985). The United States signed the treaty on April 18, 1988.

**34.** In *Ozdemir v. INS,* 46 F.3d 6 (1994), the 5th Circuit found that it had no jurisdiction to decide whether execution of a final order of deportation would violate the Convention Against Torture because the question was not raised on appeal to the BIA. Because of the exception to the exhaustion requirement for questions outside the jurisdiction of the BIA, we find it necessary to independently consider whether this court has subject matter jurisdiction for claims arising under the treaty. *See In re H–M–V,* 1998 WL 611753 (Aug. 25, 1998 BIA).

**35.** Dated May 10, 1988.

the treaty itself. Article 14, for example, does not create a private right of action for victims of torture; it merely requires each signatory to ensure that appropriate avenues for redress exist within its own legal system.[36] Accordingly, Congress passed the Torture Victim Protection Act of 1991 (TVPA), Pub.L.No. 102–256, 106 Stat. 73, *enacted* March 12, 1992, which provides victims of torture with a private cause of action against the perpetrators of such abuse.[37][38] As for an individual in U.S. custody with a credible fear of persecution upon return to his or her native country, Congress has enacted a comprehensive scheme governing the award of asylum. *See* 8 U.S.C. § 1158 and § 1225(b)(1)(B)(ii). Nothing in the U.S. ratification of the Convention Against Torture supplants or supercedes these specific congressional enactments. This court's conclusion that the Convention Against Torture was not intended to be self-executing is consistent with the view of at least one other federal court which has considered the question. *See White v. Paulsen,* 997 F.Supp. 1380 (E.D.Wash.1998). We find, therefore, that we have no jurisdiction to resolve Calderon's claims brought under Article III, Section 1 of the Convention Against Torture.

### CONCLUSION

For the foregoing reasons, Calderon's petition is dismissed.

---

**36.** Article 14 reads in relevant part:
Each State party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation including the means for as full rehabilitation as possible.... Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.

**37.** *See Xuncax v. Gramajo,* 886 F.Supp. 162 (D.Mass.1995) (discussing the TVPA and 18 U.S.C. § 2340A, which makes torture or attempted torture a federal offense as of the later of April 30, 1994 or the date on which the United States becomes a party to the Convention Against Torture).

**38.** Moreover, the Convention Against Torture and the TVPA address state-sponsored or state-sanctioned abuse. We note that Calderon's apprehension regarding the private behavior of Perez' colleagues would not fall within the perimeter of either enactment.